# NORFOLK COUNTY.

## CITY OF BOSTON *vs.* THOMAS RICHARDSON.

A record in the original Book of Possessions of the town of Boston, which book appears to have been made between 1639 and 1645, of a possession of a house and lot "bounded with the street," shows title in the possessor to the centre of the street, even if the possession was granted by the general court or the town after the street had been laid out.

Whenever land is described as bounded by other land, or by a building or structure the name of which, according to its legal and ordinary meaning, includes the title in the land of which it has been made part, as a house, a mill, a wharf, or the like, the side of the land or structure referred to as a boundary is the limit of the grant; but where the boundary line is simply by an object, whether natural or artificial, the name of which is used in ordinary speech as defining a boundary, and not as describing a title in fee, and which does not in its description or nature include the earth as far down as the grantor owns, and yet which has width, as in the case of a way, a river, a ditch, a wall, a fence, a tree, or a stake and stones, then the centre of the thing so running over or standing on the land is the boundary of the lot granted.

The rule of construction that public grants are to be taken most strongly against the grantee is only to be resorted to when the language is so ambiguous that all other rules of construction fail; and when words having an established and definite meaning are used in an ordinary grant of land, they are to receive the same construction whether the grant is a public or a private one.

A town may make common sewers and drains under a highway, whether it owns the soil or not.

A record of "staking out" a highway in Boston in 1683 furnishes no evidence that the town did, or did not, own the land under it.

Upon the trial of a writ of entry to recover flats to which the tenant claims title, and the course of the side lines of which is in issue, the declaration in a former action on the case, brought against the demandant by the tenant, describing these flats as not belonging to him, is admissible in evidence against him.

Evidence of a line established under and according to a judgment in an action between the owners of adjoining parcels of flats is admissible in a subsequent action between one of them and a third person concerning another parcel of flats in the same cove, so far as it tends, in connection with other evidence, to identify and locate the monuments by which the lines of the latter parcel have been drawn, and so far only.

Upon the trial of a writ of entry to recover a parcel of flats, the course of the lines established in the division of flats belonging to another estate in the same cove, under the owners of which neither of the parties to this action claims title, and separated from the flats in question by intervening estates, the lines of which are not allowed to be given in evidence, is inadmissible to show the course of the side lines of the demanded premises.

GRAY, J.* This is a writ of entry, brought by the city of Boston to recover the fee of a strip of land thirty feet wide, extending eastwardly from the foot of Summer Street in Boston, and below the original line of high water mark. The tenant pleaded the general issue.

It was proved at the trial that the tenant owned the land and flats on each side of the demanded premises, and had the title which Richard Gridley and Nicholas Baxter had more than two centuries ago in lands bounded on the street, and thus described in the original Book of Possessions of the town of Boston :

" Richard Gridley, his possession in Boston. One house and lot, bounded with the street south and west, the bay easterly, and John Harrison northerly."

" Nicholas Baxter, his possession within the limits of Boston. One house and lot, bounded with the street or lane north and west, Edward Brown and the bay east, Matthew Jyons southward."

1. The tenant asked that the jury might be instructed that, by the true and legal construction of these possessions, they extended to the centre of the street on which they were bounded ; and, whether the grants to Gridley and Baxter were made before or since the ordinance of 1647, the fee of the adjoining flats passed by or as the result of these grants to Gridley and Baxter or their grantees. This instruction was refused ; and the jury were instructed that the early ordinances of the colony, and the acts and grants of the town of Boston from the earliest times, which had been given in evidence, warranted and required the jury to presume that the title of all the lands above high water mark in this part of Boston, (being the part next the sea and the earliest settled,) was in the town by grant from the general court of the colony, except so far as granted by the colony or the town to others; that if the possessions of Gridley and Baxter were granted before the highway between them was laid out, the fee in the highway remained in the abutters ; but

---

* This case was argued at Boston in January 867, before all the judges but HOAR, J.

if these grants were made by the town, or other public authority, after the highway had been laid out, the grantees took no title in the land under the highway; and that by the ordinance of 1647 the proprietor, whether the town or an individual, of any land bounding on the sea had the title in the flats to low water mark, if within one hundred rods of high water mark. To these instructions and refusal to instruct the tenant alleged exceptions. The jury have found by their verdict, under instructions to which no exception was taken, that the way was laid out before the grants or allotments to Gridley and Baxter were made. The principal question in the case arises upon the construction and effect of the record of these possessions, in determining which it is important to bear in mind the early legislation and practice under the colony charter in relation to grants of land, as shown by the records given in evidence at the trial and the public acts of the colony.

The granting of lands to actual settlers in order to promote the establishment of the colony occupied from the beginning much attention and consideration of the associates in the enterprise. Presently after the organization of the company under the charter, it was ordered that allotments of land to actual settlers should be made by Governor Endicott (who had been previously sent out, and furnished with duplicates of the royal charter and the common seal of the company) and his council in the government of the plantation; that upon their failure to make such allotment within ten days after arrival and demand by any adventurer in the common stock or his servant, he might seat himself, build a house and inclose a certain quantity of land; and that " conveyance be made in the company's name, with the common seal of the company to it, to any that shall desire it, for each man's peaceable enjoying of the land he holds, at the charge of the company." 1 Mass. Col. Rec. 37 e.–37 i., 38, 42–44, 386 & seq. As no records have been preserved of Governor Endicott's administration before the transfer of the government of the company to this side of the ocean, it cannot be known to what exten allotments of lands were made pursuant to these orders. It is not probable that any were made

in Boston, and these orders are worthy of mention here only as aiding the interpretation of subsequent ordinances of the colony.

At the second meeting of the court of assistants after the arrival of Governor Winthrop with the original charter, it was ordered that " no person shall plant in any place within the limits of this patent, without leave from the governor and assistants, or the major part of them." 1 Mass. Col. Rec. 76. The colony records show that for three or four years after the transfer of the charter the power of granting lands and other powers of government were often exercised by the court of assistants. But in 1634 the general court, consisting of the governor, deputy governor, and assistants, and all the freemen of the company, (which had power by the charter to make laws and ordinances for the government of the colony and its inhabitants,) declared that none but the general court had power to choose and admit freemen, to make laws, to elect or remove high officers and define their powers and duties, to raise moneys and taxes, or " to dispose of lands, viz. to give and confirm proprieties." 1 Mass. Col. Rec. 117. The manifest object of this ordinance (which was passed at the same session with that which first authorized the freemen to choose deputies to the general court) was to restrain the governor and assistants from exercising legislative powers without the assent of the freemen ; not to define the rights and powers of towns, or to prevent grants by towns, already established, of lands within their bounds as already fixed, which had by the very organization of the towns vested in them for the purpose of being divided among the inhabitants or held for public uses. *Clark* v. *Williams*, 19 Pick. 501. *Commonwealth* v. *Roxbury*, 9 Gray, 485 *&* *seq.* *West Roxbury* v. *Stoddard*, 7 Allen, 169. *Tappan* v. *Burnham*, 8 Allen, 71. *Berry* v. *Raddin*, 11 Allen, 579, 580. In the revisions of the colony laws this is made clear by adding, after the word " proprieties,"."appertaining to and immediately derived from the country." Mass. Col. Laws, (ed. 1660,) 21; (ed. 1672,) 34; Anc. Chart. 88. Boston had been recognized as a distinct town on the 7th of September 1630 ; many houses were immediately built there ; and in 1632 additional land was granted to it " to be enjoyed by the

inhabitants thereof forever." 1 Mass. Col. Rec. 75, 101. 1 Winthrop's Hist. New England, 38, 48, 55. The existing records of the town of Boston, which date only from September 1634, show that from that time the town, through a committee of its inhabitants chosen in general town meeting, freely exercised the power of granting lands within the town. On the 3d of March 1635–6 the general court enacted that the freemen of every town should " have power to dispose of their own lands and woods, with all the privileges and appurtenances of the said towns, to grant lots, and make such orders as may concern the well ordering of their own towns, not repugnant to the laws and orders here established by the general court." 1 Mass. Col. Rec. 172. It appears however by the records of the colony that the rights and powers of the towns in lands within their limits were considered as subordinate to the paramount power of the general court at its discretion to grant lands in any town, not already granted to individuals. 1 Mass. Col. Rec. 101, 102, 103, 111, 129, 130, 240. *West Roxbury* v. *Stoddard,* 7 Allen, 169, 170. The instruction to the jury as to the presumption of the title of the town in the lands above high water in this part of Boston was therefore sufficiently favorable to the tenant, as was assumed by both parties at the argument.

The court of assistants on the 1st of April 1634 ordered that the constable and four other persons chosen by the freemen in every town, with the advice of one or more of the next assistants, should make a survey of the houses and lands, " improved, or inclosed, or granted by special order of the court, of every free inhabitant there," and " enter the same in a book, (fairly written in words at length, and not in figures,) with the several bounds and quantities by the nearest estimation," and " deliver a transcript thereof into the court within six months now next ensuing; and the same so entered and recorded shall be a sufficient assurance to every such free inhabitant, his and their heirs and assigns, of such estate of inheritance, or as they shall have in any such houses, lands or franktenements ; " and that " the like course shall be taken for assurance of all houses and town lots of all such as shall be hereafter enfranchised · "

and fixed the fee to be paid upon the entry therein of every sale or grant of such houses or lots, or a copy thereof under the hands of the surveyors. About a year after, the general court enacted that "the order made in April 1634, for the assuring of lands and house lots for freemen, shall forthwith be put in execution; and that those which are not freemen, that have taken or shall hereafter take their oaths respectively, shall have the same assurance of land as in that order is provided for freemen;" and in 1639 passed another ordinance "to record all men's houses and lands, being certified under the hands of the men of every town, deputed for the ordering of their affairs." 1 Mass. Col. Rec. 116, 137, 276. This survey and record would include not only lands "granted by special order" of the general court or court of assistants, but also lands "improved or inclosed," either under grants from towns or individuals since the transfer of the charter, or under allotments made by Governor Endicott, or possessions taken in default of such allotment, during his previous administration, or by any other title or occupation. It is to be remembered that in Massachusetts, before the colonial ordinance of 1652, as before the Statute of Frauds in England, lands might be and sometimes were transferred by word of mouth and livery of seisin, without deed. 4 Mass. Col. Rec. pt. i. 101. 2 Bl. Com. 297. In every case, whatever the source of title, this record was of itself " a sufficient assurance " of the estate, and had the same effect as a grant under the seal of the company, or by a recorded vote of the general court or of a town, or a private deed. " The legal evidences" of a transfer of property, says Blackstone, " are called the common assurances of the kingdom; whereby every man's estate is assured to him, and all controversies, doubts and difficulties are either prevented or removed." 2 Bl. Com. 294.

The Book of Possessions of the town of Boston, though it bears no date or official certificate, was probably made under the ordinances above quoted, and is legal evidence of the titles recorded in it. *Rust* v. *Boston Mill Corporation,* 6 Pick. 158 The greater part of the book, including the record of Gridley's and Baxter's possessions, appears to have been written at one

time.  Gridley had taken the oath of a freeman in 1634.  1 Mass. Col. Rec. 368.  Baxter, whose possession is recorded on the next page after Gridley's, was " admitted to be an inhabitant," as appears by the town records, on the 5th of November 1639.  Three pages further on, under date of September 30th 1639, is the only entry of a grant from the town, which is accompanied by a date.  It may therefore be inferred that the book was not made before 1639 ; and it cannot well have been later than 1645, inasmuch as of the numerous entries of conveyances from the original possessors to other persons, all of which are dated, and entered on the same pages with the lands already held by the respective grantees, there are several entered early in 1646.

The ordinance extending below high water mark the title of the owners of lands upon the salt water was passed in 1647. *Commonwealth* v. *Alger*, 7 Cush. 67, 68.  3 Mass. Col. Rec. 4, 181.  2 Mass. Col. Rec. 284.  Whether by this ordinance the town or the abutters on this street took the flats at the end of the street depends upon the question which then owned the land over which the street was laid.  *Adams* v. *Frothingham*, 3 Mass. 360, 361.  *Porter* v. *Sullivan*, 7 Gray, 445.  And this again depends upon the effect of the description of the possessions of the abutters as " bounded with the street."  This question of title, as we understand, is now for the first time presented by the parties for adjudication.  It was not raised or decided in the litigation between them in the courts of the United States.  *Boston* v. *Lecraw*, 17 How. 434.  *Richardson* v. *Boston*, 19 How. 265, 267, 269 ; *S. C.* 24 How. 193.

In some opinions of this court it has indeed been implied or asserted that a boundary upon a road or street passed no title in the land under it.  But in the more recent decisions the general rule has been repeatedly declared, and must now be regarded as the settled law of the Commonwealth, overruling whatever is irreconcilable in the earlier cases, that a deed bounding land generally by a highway, with no restrictive or controlling words, conveys the grantor's title in the land to the middle of the highway.  *Newhall* v. *Ireson*, 8 Cush. 598.  *Phillips* v. *Bowers*

7 Gray, 24–26. *Fisher* v. *Smith,* 9 Gray, 444. *Hollenbeck* v. *Rowley,* 8 Allen, 473. And in *Rice* v. *Worcester,* 11 Gray, 283, *note,* it was held that the title of the owner of land abutting on a highway must be presumed to extend to the centre of the highway, although the way was so ancient that its origin was unknown. These decisions are in accordance with the law as established in other states and in Great Britain. 3 Kent Com. (6th ed.) 432–434, and authorities cited. *Banks* v. *Ogden,* 2 Wallace, 68. *Bissell* v. *New York Central Railroad,* 23 N. Y. 61. *Marsh* v. *Burt,* 34 Verm. 289. *Galbreath* v. *Armour,* 4 Bell App. Cas. 374. *Berridge* v. *Ward,* 10 C. B. (N. S.) 400. *The Queen* v. *Strand District Board of Works,* 4 Best & Smith, 548, 553.

The question whether any grant extends to the side line or the centre line of the highway is doubtless, according to the statement made by Chief Justice Shaw in *Webber* v. *Eastern Railroad,* 2 Met. 151, and approved by the court in *Codman* v. *Evans,* 1 Allen, 446, " a question of construction in each particular case, and depends, as in all other cases, upon the intent of the parties, as expressed in the descriptive parts of the deed, explained and illustrated by all the other parts of the conveyance, and by the localities and subject matter to which it applies." The owner of land by the side of the highway, and under it to the centre thereof, may of course, by using apt words, limit his grant to the edge of the highway, and retain his title in the fee of the soil over which the highway runs. *Sibley* v. *Holden,* 10 Pick. 249. *Phillips* v. *Bowers,* 7 Gray, 24, 25. *Smith* v. *Slocomb,* 9 Gray, 36 ; *S. C.* 11 Gray, 280. *Brainard* v. *Boston & New York Central Railroad,* 12 Gray, 407. 3 Kent Com. 434. But in the absence of words clearly manifesting an intent so to do, the law presumes that he did not intend to reserve the title in a strip of land, not capable of any substantial or beneficial use by him, after having parted with the land by the side of it, while the highway remains, nor ordinarily of any considerable value to him if the way should be discontinued, and the ownership of which by him might greatly embarrass the use or disposal, by his grantee, of the lot granted.

The fact that the grantor owns other lands to and over

which the way runs affords no reason for giving a different effect to words bounding the land granted by a way. In *Fisher* v *Smith,* 9 Gray, 441, it was held that a deed of land " bounded on " a private way leading over other land of the grantor to his own dwelling-house passed the fee in the land under the way to its centre. See also *Winslow* v. *King,* 14 Gray, 321 ; *Jamaica Pond Aqueduct* v. *Chandler,* 9 Allen, 159. And in England the presumption that the owner of land by the side of a way owns the fee to the middle has been applied equally to public and private ways. *Berry & Goodman's case,* 2 Leon. 148. *Holmes* v. *Bellingham,* 7 C. B. (N. S.) 329.

The presumption that the title of land bounded by a way passes to the middle of the way, unless expressly and distinctly restricted to the side, is the same that is applied by the law in analogous cases. Chancellor Kent, in his latest edition of his Commentaries, says, " It may be considered as the general rule, that a grant of land bounded upon a highway or river carries the fee in the highway or river to the centre of it, provided the grantor at the time owned to the centre, and there be no words or specific description to show a contrary intent." 3 Kent Com. 433, 434. And the law is now well settled that a deed of land, bounded by a river above tide water, whether navigable or not, conveys the grantor's fee in the soil to the thread of the river, unless clearly reserved in the grant. If the conveyance bounds the land by the river, it includes the bed of the river ; but if it bounds by the shore or the land under the river, that shore or land does not pass. 3 Kent Com. 427, 428. *Jones* v. *Soulard,* 24 How. 41. *Lunt* v. *Holland,* 14 Mass. 149. *Hatch* v. *Dwight,* 17 Mass. 289. *Bradford* v. *Cressey,* 45 Maine, 9. So a deed of land bounded by " a mill pond," which has been artificially created by building a dam across a fresh water stream, passes the land to the thread of the stream. *Phinney* v. *Watts,* 9 Gray, 269. The general rule of construction may be thus stated : Whenever land is described as bounded by other land, or by a building or structure, the name of which, according to its legal and ordinary meaning, includes the title in the land of which it has been made part, as a house, a mill, a wharf, or the like, the

side of the land or structure referred to as a boundary is the limit of the grant; but when the boundary line is simply by an object, whether natural or artificial, the name of which is used in ordinary speech as defining a boundary, and not as describing a title in fee, and which does not in its description or nature include the earth as far down as the grantor owns, and yet which has width, as in the case of a way, a river, a ditch, a wall, a fence, a tree, or a stake and stones, then the centre of the thing so running over or standing on the land is the boundary of the lot granted.

A corresponding rule has been steadily and consistently applied to conveyances of land by the sea, the owner of which, by virtue of the colonial ordinance of 1647, has the title in the shore or flats within one hundred rods of high water mark and above low water mark. Thus a boundary by a tide water creek, from which the tide wholly ebbs at low water, carries the flats as far as the centre of the creek, unless limited by special words. *Harlow* v. *Fisk*, 12 Cush. 304. *Chapman* v. *Edmands*, 3 Allen, 512. So a boundary " on a river " within the ebb and flow of the tide, or " on the stream " of such a river, passes the title of the grantor to the extent of his ownership, unless expressly restricted to the shore or bank. *Dunlap* v. *Stetson*, 4 Mason, 366. *Thomas* v. *Hatch*, 3 Sumner, 178, 179. *Lapish* v. *Bangor Bank*, 8 Greenl. 85. *Moore* v. *Griffin*, 22 Maine, 350. In short, any boundary by the tide water, by whatever name, whether " sea," " harbor," or " bay," includes the land below high water mark, as far as the grantor owns; but a boundary by that land itself, whether described as " shore," " beach," or " flats," excludes it. See cases collected in 9 Gray, 524.

It was argued by the learned counsel for the city that the Book of Possessions was merely a record of existing possessions, that the actual possessions were necessarily bounded by the edge of the highway, and that the effect of the record was out to confirm the possessions to the same extent. When indeed the possession of land bounded on a highway originates in wrong and disseisin, it may be limited to the side of the highway, because titles resting in disseisin are not to be extended by construction, and the disseisor can hold so much land only as

he has occupied adversely, just as a disseisor of land on the sea shore acquires so much only of the flats, which are parcel of the land, as he actually occupies. *Wheeler* v. *Stone*, 1 Cush. 317, 322. *Drake* v. *Curtis*, Ib. 416–418. But we know no reason for assuming, in the absence of proof, and in view of the generous policy of the colonial government, the facility with which titles might have been rightfully acquired, and the evidence in the town records and the Book of Possessions of a systematic division of much of the land in the town among its inhabitants, that Gridley and Baxter had acquired possession wrongfully. And the Book of Possessions, as already stated, was not a mere record of possession, but an assurance of title. Such a record would be of little value as an assurance, if resort could be had to oral evidence, or, failing that, to conjecture, concerning the previous source of each title, before giving a construction to the language used in the record.

It was also argued that a different rule should be applied to boundaries of this kind in public grants, because they are to be taken most strongly against the grantee. *Commonwealth* v. *Roxbury*, 9 Gray, 492. But that rule, like its converse in favor of the grantee in private grants, is only to be resorted to when the language is so ambiguous that all other rules of construction fail. In *Commonwealth* v. *Roxbury*, the rule was referred to only to refute the argument that a grant from the colony to the town of Roxbury was to be construed favorably to the grantee; the grant under consideration, according to its natural meaning, defined only the boundaries on the three other sides and not that towards the shore; it was made before the passage of the ordinance annexing the flats to the adjoining land; the flats in question were more than one hundred rods below high water mark, and therefore could not pass under any construction of the grant or the ordinance; and much stress was laid upon the fact that the sea shore in question was not like land above high water mark to be granted to settlers and purchasers to be held in severalty in fee, but a portion of the public domain, which the government held by a prerogative right in a fiduciary relation, for general and public use. The considerations on which cessions

by one state to another, of territory bounded by a river, have been deemed to be limited to low water mark, leaving the soil under the permanent channel of the river in the state which originally owned the whole, have been derived from the law of nations, and not from the rules of municipal law which govern common assurances of estates. *Handly's lessee* v. *Anthony*, 5 Wheat. 374. *Howard* v. *Ingersoll*, 13 How. 412, 424. *Alabama* v. *Georgia*, 23 How. 505.

But when words having an established and definite meaning are used in an ordinary grant of land within a state, that meaning must be carried into effect, whether the grant is a public or a private one. Acts of the legislature, establishing a new town bounded by a river, have constantly received the same construction, from this court as well as in New Hampshire, as deeds of individuals using like words. *Ipswich, petitioners*, 13 Pick. 431. *Cold Spring Iron Works* v. *Tolland*, 9 Cush. 492. *State* v. *Canterbury*, 8 Foster, 195, and cases cited. And there are two pre-. cedents, from widely different sources, but each entitled to great weight, and singularly in point, for applying the same rule to a grant to a citizen from the town or from the government, as to a private grant, in ascertaining the construction of a boundary of this description.

Upon petitions of the inhabitants of Ipswich and Gloucester in 1669, the general court of the Colony of Massachusetts, which exercised supreme powers in interpreting, as well as in making laws, held that a grant from a town of its lands " to a river " within the ebb and flow of the tide passed the flats, unless restricted by other words of boundary; or, in the words of the record, " the court judgeth it meet to declare that notwithstanding the law about privilege to low water mark one hundred rods, yet when towns do not grant their lands to the rivers, but otherwise bound men's lands that lie by the riverside there, they have not liberty to claim further right by the said law; though where no bounds were set or reserves made in grants, the court declares that the said law must take place and doth clearly determine the case, it remaining with the court to consider the law as they see cause." 4 Mass. Col. Rec. pt. ii. 427, 428.

In *Lord* v. *Commissioners of Sydney,* 12 Moore P. C. 473, it was held that a grant from the crown by the governor of New South Wales of lands bounded " to " and " by a small creek " of fresh water, passed the soil to the thread of the creek; and Sir John Coleridge, in delivering judgment, said : · Their lordships are clearly of opinion that, upon the true construction of this grant, the creek, where it bounds the land, is *ad medium filum* included within it. In so holding they do not intend to differ from old authorities in respect to crown grants ; but upon a question of the meaning of words, the same rules of common sense and justice must apply, whether the subject matter of construction be a grant from the crown, or from a subject; it is always a question of intention, to be collected from the language used with reference to the surrounding circumstances." " Words in an instrument of grant, as elsewhere, are to be taken in the sense which the common usage of mankind has applied to them in reference to the context in which they are found. If lands granted were described as bounded by a house, no one could suppose the house was included in the grant; but if land granted were described as bounded by a highway, it would be equally absurd to suppose that the grantor had reserved to himself the right to the soil *ad medium filum,* in the far greater majority of cases wholly unprofitable." And after citing Kent's Commentaries, *ubi supra,* as safely to be relied on in any question of general principle, he added, " Tried according to these principles, it appears clear to their lordships that the description of the boundaries in this grant does not exclude from it that portion of the creek which by the general presumption of law would go along with the ownership of the land on the bank of it. The crown had the power of granting it; no reason can be assigned why it should have reserved what might be directly and immediately useful to the grantee, and could scarcely have been contemplated as of any probable use to the crown ; and this too in an infant colony, where it was the manifest and avowed policy to encourage settlement and the cultivation of land by grants on the easiest and most favorable terms." 12 Moore P. C. 496–498.

It was further suggested, as a reason for presuming that a town, granting land bounded on a highway, should wish to retain the fee of the way, that the town does not, like a private grantor, give up all use of the way, but, on the contrary, keeps it in repair, raises and lowers it, carries earth and stones on and off of it, lays sewers and gas-pipes under it, and railways upon it, and that all these acts are as consistent with the ownership of the fee as with that of an easement. If such acts were inconsistent with a mere easement, there would be great force in the suggestion. But that is hardly contended.

The right of the public in a highway, even when so ancient that its origin is unknown, is ordinarily limited to an easement for the purposes of travel; and upon the taking of land for a highway by authority of the legislature very clear words are necessary in order to vest in the public the fee in the soil. *Stackpole* v. *Healy*, 16 Mass. 33, and authorities cited. *Harris* v. *Elliott*, 10 Pet. 34, 55. *United States* v. *Harris*, 1 Sumner, 21. *Galbreath* v. *Armour*, 4 Bell App. Cas. 382, 391. Yet in any highway the municipal authorities may do all acts appropriate or incidental to its use by the public. They may raise or lower the surface, dig up the earth, cut down trees, or do any other thing necessary or proper to keep the highway in suitable repair and condition. Whenever land is taken for public use as a highway, and due compensation made, the public, or those corporations or officers who act as trustees or agents of the public, have a right to make any use of the land, directly or incidentally conducive to the enjoyment of the public easement, and which the necessity or convenience of the public may require; the landowner receives a sum in damages which in theory of law is an indemnity for all such uses, unless special provision for further compensation is made by statute; and such uses clearly include the making of culverts, drains and sewers under the highway for the cleansing of the streets and the accommodation of the inhabitants on either side. *Brainard* v. *Clapp*, 10 Cush. 8–10, and cases cited. *Codman* v. *Evans*, 5 Allen, 309. *Cone* v. *Hartford*, 28 Conn. 363. *West* v. *Bancroft*, 32 Verm. 367. *People* v. *Kerr*, 27 N. Y. 203, 204. The right of digging in the highways for

the purpose of laying and repairing common sewers and drains was expressly affirmed and regulated, without providing for compensation to any one, in the earliest statute of Massachusetts upon the subject. Prov. St. 8 Anne, c. 3; Mass. Prov. Laws, (ed. 1726,) 203; Anc. Chart. 389. The public must have as extensive powers over land which it has granted, reserving a highway therein, as over land in which it has taken an easement for the same purpose under the right of eminent domain. And at the trial of this case it was ruled, without exception by either party, that evidence that the town had been accustomed to make drains and sewers through the demanded premises was immaterial to the question whether it owned the fee or only an easement for a highway.

That the town or its officers or any other persons would have the right, without express authority from the legislature, to lay gas-pipes or street railways in the highways, is not so clear. In Great Britain, it has been held that they could not. *Galbreath* v. *Armour,* 4 Bell App. Cas. 374. *The Queen* v. *Longton Gas Co.* 2 El. & El. 651. *The Queen* v. *Charlesworth,* 16 Q. B. 1012. *Regina* v. *Train,* 9 Cox Crim. Cas. 180. But it is unnecessary to consider how far the same rule would apply in this state; for it is certain that the use of gas and railways was not contemplated in Massachusetts when Gridley and Baxter acquired their titles, and cannot influence the construction or extent of those titles; we are not aware that such powers have ever been exercised in Massachusetts, except by virtue of express statutes; and it is well settled that when land, once duly appropriated to a public use which requires the occupation of its whole surface, is applied by authority of the legislature to another similar public use, no new claim for compensation, unless expressly provided for, can be sustained by the owner of the fee. *Chase* v. *Sutton Manuf. Co.* 4 Cush. 152. So far as the laying of gas-pipes and street railways is incidental or similar to the use of the land for a common highway, the owners of the land could claim no damages therefor. So far as either must be considered as a new and distinct use of the soil, not contemplated when the owners of the lots on either side of the highway acquired

their titles, there is no more reason for inferring an intention in the general court or the town to reserve such a use than if the land had been taken for a highway after these possessions had been granted.

We are therefore unanimously of opinion that the instruction which was given to the jury, that if the possessions of Gridley and Baxter were granted by the town or other public authority after the highway between them had been laid out, they took no title in the land under the highway, was erroneous; that the jury should have been instructed, as requested by the tenant, that these possessions, according to their true and legal construction, extended to the centre of the street on which they were bounded; and that the tenant is entitled to a new trial. As we cannot anticipate what effect a change of ruling upon this question may have, it is proper to dispose of the other exceptions which have been argued.

2. It appeared by the records of the town that the selectmen in 1683 " staked out a highway for the town's use," (now Summer Street,) which the jury found was over the street between the possessions of Gridley and Baxter; and on the same day " staked out another highway for the town's use," where Federal (formerly Sea) Street now is. The tenant introduced evidence which, as he contended, showed that the second way was laid out over private lands; and asked that the jury might be so instructed. But this instruction was refused as immaterial; and the jury were instructed that the use of the words " staked out," in the record of 1683, neither proved that the town did previously own the land under either way, nor that it did not, and that by staking out a highway the town would neither lose a title in fee which it had, nor gain one which it had not. The court is of opinion that in this there was no error. The question of the ownership of the land over which these ways were laid out was immaterial to the construction of the words " staked out " in the record; for those words describe only the act of de fining by stakes or other monuments the line of the highway, and have no relation to the title of the land over which the highway is laid. That these words had this meaning at that

time is apparent from the orders of 1676–77 in 5 Mass. Col. Rec. 140.

3. The parties were at issue, not only upon the title in the demanded premises at the original line of high water mark, but also upon the legal course of the side lines upon the flats. The record of an action on the case, previously brought in the circuit court of the United States by Richardson against the city, in which he alleged himself to be the owner of the wharves on each side of the premises now demanded, and described the intervening dock as not belonging to him, was rightly admitted in evidence against him, as tending to show that he had not the title in that dock which he now claims.

4. Evidence as to the line established between the parties to the action of *Valentine* v. *Piper*, 22 Pick. 85, and defined by monuments in accordance with the judgment in that action, in which Richardson was the real plaintiff, and the defendant in which was the owner of the estate on the shore next to the south of Richardson's, was admissible so far as it tended to locate and identify the monuments by which the lines of the premises now in question were drawn, and so far only. Whether the evidence introduced by the city at the trial was sufficient to justify its admission for this purpose, we need not now particularly examine, as upon the new trial the evidence may be varied.

5. The tenant, while objecting to the admission of the line established by the judgment in *Valentine* v. *Piper*, offered in evidence a division in 1786, by commissioners appointed by the probate court, of the estate of Jabez Hatch, which lay to the south of Piper's, to show the course of the lines of Hatch's estate upon the flats, as bearing upon the question of an agreement between the proprietors of estates in the cove, settling the course of the lines by which the flats should be divided. This division was excluded, and, in the opinion of the full court, rightly. The course upon the flats of the lines established in dividing a single estate in the same cove, under the owners of which neither party to this action claims title, and separated from the land in question by intervening estates, the lines of which were not allowed to be given in evidence, had no tendency to

show the course in which, by the rules of law or by agreement of proprietors, the lines of the demanded premises should be run. *New trial ordered.*

*S. Bartlett & J. G. Abbott,* for the tenant.

*G. O. Shattuck & G. Putnam, Jr., (P. W. Chandler* with them,) for the demandants.