## BOARD OF PUBLIC WORKS OF MARYLAND ET AL. *v.* LARMAR CORPORATION ET AL.

[No. 345, September Term, 1970.]

*Decided May 10, 1971.*

26

The cause was argued on March 8, 1971, before HAMMOND, C. J., and FINAN, SINGLEY, SMITH and DIGGES, JJ., and reargued on April 5, 1971, before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

Argued and reargued by *Jon F. Oster, Assistant Attorney General,* and *Richard M. Pollitt, Special Attorney,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellants.

Argued and reargued by *Victor H. Laws* for Larmar Corporation, appellee and cross appellant. Argued and reargued by *Raymond S. Smethurst, Jr.,* with whom were *Henry M. Rutledge* and *Adkins, Potts & Smethurst* on the brief, for The Adkins Company of Ocean City, Inc., other appellee and cross appellant.

FINAN, J., delivered the opinion of the Court.

Although collateral issues will be discussed, the two paramount questions before this Court concern, (1) the rights of riparian owners to reclaim land by filling in navigable waters in front of their shoreline, making new fast land, within the scope and intent of Maryland Code (1968 Repl. Vol.), Art. 54, §§ 45, 46, and 48, hereinafter referred to as the Act of 1862, and (2) the question of whether such riparian rights may be restricted, and if so to what extent, by the provisions of Sections 15A and 15B of the Public Local Laws of Worcester County (Chs. 757 and 690 of the Laws of 1965) establishing the Worcester County Shoreline Commission and Ch. 241 of the Laws of 1970 (Code (1970 Repl. Vol.), Art. 66C, §§ 718 through 731), titled "Natural Resources," sub-titled "Wetlands," which we shall hereafter refer to as the 1970

Wetlands Act. The Act of 1862, §§ 15A and 15B of the Public Local Laws of Worcester County, and the 1970 Wetlands Act are the three legislative enactments with which we shall primarily be concerned in this opinion.

This appeal was taken by the Board of Public Works and the Maryland Water Resources Commission from an order passed on August 31, 1970, by Judge Daniel T. Prettyman in the Circuit Court for Worcester County in a declaratory judgment proceeding brought by the Larmar Corporation (Larmar) against the Worcester County Shoreline Commission, the Board of Public Works and the Maryland Water Resources Commission. After Larmar had filed its petition The Adkins Company of Ocean City, Inc. (Adkins) was granted leave to intervene as a party plaintiff. Both Larmar and Adkins have filed cross appeals. The Worcester County Shoreline Commission did not file an appeal from the order of the circuit court and is not a party to this appeal.

Larmar filed its petition on October 3, 1969, seeking a declaratory judgment of its contractual and legal rights in, and title to, five parcels of property which it owned and which it described as "wetlands" and filled or partially filled lands along the shorelines of the navigable waters of Worcester County. Larmar also sought a declaratory judgment of its legal rights with respect to a parcel of property that it had recently held as lessee with option to purchase. This property, which is referred to as the "Hoddinott-Richards Property," is located in Ocean City along the shorelines of the navigable waters of the Isle of Wight Bay in Worcester County. The circuit court's opinion was limited to a determination of the issues raised with respect to the Hoddinott-Richards Property; however, the circuit court observed that resolution of the issues with respect to the Hoddinott-Richards Property would resolve all similar issues arising, at least with respect to the four other parcels of property owned by Larmar which are located in Ocean City.

In 1964 Larmar was seeking a site for an amusement

park in Ocean City and selected the Hoddinott-Richards Property as a desirable location. Larmar procured the purchase of the property by Lura A. Richards, Inc. and the lease-back thereof to Larmar's subsidiary, Ocean Playland, Inc., by an unrecorded lease agreement for five years expiring March 23, 1969, with a renewal option and a purchase option.

The lease agreement contained a covenant by which Larmar's subsidiary, as tenant, agreed to fill the property to approximately 400 to 425 feet westerly into the waters of the Bay from Seabay Drive at the elevation of the highway. Such work was done by hauling truckloads of fill from the mainland which was dumped on the property, raising the elevation of the fast land, covering the marsh, and filling a gut or inlet and land under the waters of the Bay. Larmar's subsidiary obtained from The Title Guarantee Company of Baltimore, Maryland, a title insurance policy for the land without exception as to such filling or the filled-in area. After the filling the tax assessment on the land was raised and Larmar's subsidiary paid real estate taxes on the land to Worcester County, the Town of Ocean City, and the State of Maryland through the term of the lease up to April 14, 1969, when Larmar traded the property.

Larmar's subsidiary was forced to abandon its plan to construct an amusement park on the Hoddinott-Richards Property because the necessary zoning permits could not be obtained. Larmar then acquired the Playland Property by deed dated October 22, 1964. This property is bounded on the east by Seabay Drive, and on the north and south by the westerly extensions of 66th Street and 65th Street respectively, and on the west by the Bay. At the time of its acquisition it had approximately 400 to 500 feet of marsh west of Seabay Drive with an elevation approximately 2½ feet above mean low water which was crisscrossed by drainage ditches. After obtaining a permit from the Army Corps of Engineers, Larmar and its subsidiary had the property filled and extended west

a distance of approximately 1,400 feet at a width of approximately 350 feet. Such filling was done by the bulkheading-dredging method, whereby the area to be filled is enclosed by bulkheads, and earth fill dredged by a floating hydraulic dredge from surrounding bay bottoms (the borrow area) is pumped into the enclosure until the level of the enclosed area is raised to the top of the bulkheads. Approximately 103,000 cubic yards of dredged material were deposited at a cost of $55,000. The dredging was completed about December 15, 1964, and thereafter Playland Amusement Park was constructed on the filled-in land. The park opened for business on or about June 1, 1965. The construction of the amusement park cost in excess of $1,000,000 and Larmar and its subsidiary have paid real estate taxes to Worcester County, the Town of Ocean City and the State of Maryland on the Playland property and the amusement park structures from 1965 to date.

In the case of both the Hoddinott-Richards Property and the Playland Property, the filling was completed before May 4, 1965, when bulkhead lines and borrow area limit lines were established in Isle of Wight Bay and Assawoman Bay to the west of the properties by Chapter 757 of the Laws of 1965. Additionally, on June 1, 1965, the Worcester County Shoreline Commission was created by Chapter 690 of the Laws of 1965. The Commission regulates and determines "bulkhead lines, shorelines and fill lines along the shorelines of Worcester County." A permit from the Commission is required for construction or reconstruction of bulkheads, changing a shoreline, or making a fill along the shoreline.

Another development that occurred after the filling of the two properties was the issuance of an opinion of the Attorney General of Maryland, reported in 50 *Opinions of the Attorney General* 452, dated February 14, 1965 in which the Attorney General concluded that an owner of riparian land bordering on Assawoman Bay did not have an unlimited right under existing law and the Act of

1862 to fill in areas covered by the waters of Assawoman Bay at mean high tide and that if the owner of such riparian land bordering on Assawoman Bay desired to extend his land by filling in areas covered by the waters of the Bay he must first submit his plans to the Board of Public Works. The Attorney General stated that the Board of Public Works had the authority to review any such plan in detail, determine whether the plan would bring greater public benefit to the area affected, fix an adequate consideration upon the State's property interest affected and contract with the riparian owner in a manner permitting the project to be undertaken. 50 *Opinions of the Attorney General* 452, 475.

Thereafter, the Board of Public Works began to exercise such authority and at its meeting held on August 1, 1968, adopted as a matter of State policy the following conditions with respect to applications before the Corps of Engineers and the Department of Water Resources for permits to dredge materials from the bottom of navigable waterways within the State for the purpose of filling to make new fast land:

> (1) The applicant would agree to pay to the State of Maryland 10¢ per ton (dry weight) for fill material dredged from the bottom of navigable waterways beyond any approved bulkhead line or pre-1862 land grant line.

> (2) In exchange for a quit-claim deed from the State of land lying between the mean high tide water or pre-1862 land grant line and the bulkheads to be constructed, the applicant would convey to the State of Maryland marshland of equal ecological value and of a kind and location suitable to the Board of Natural Resources on an approximate ratio of 2 acres of such marshland for every 1 acre of land deeded by the State of Maryland to the applicant.

> (3) The applicant would provide a surety

bond to the State in an amount equal to the estimated payments to be made to the State.

In 1968, Larmar opened negotiations with Adkins to exchange the Hoddinott-Richards Property for property owned by Adkins lying between the Playland Property and the Ocean Highway. Larmar and Adkins agreed to make an even trade of their respective lands provided that Larmar would pay Adkins a penalty of $75,000 if Larmar proved unable within three years to obtain either (a) authority for further filling and extension westward of the Hoddinott-Richards Property, or (b) a judgment or decree of a court of last resort that such authority need not be obtained. The exchange agreement was carried out on or about April 14, 1969, Larmar first exercising its purchase option on the Hoddinott-Richards Property and then conveying the same to Adkins.

The applicable laws under which Larmar sought its declaratory judgment were the Act of 1862, and Sections 15A and 15B of the Code of Public Local Laws of Worcester County which relate to the establishment of bulkhead and borrow area limit lines in the navigable waters of Worcester County and the Worcester County Shoreline Commission, respectively.

Sections 45, 46 and 47 of Article 54 (three pertinent sections of the Act of 1862) together with Section 485 of Article 27 were repealed by the General Assembly by the 1970 Wetlands Act which became effective on July 1, 1970. The opinion and order of the Circuit Court for Worcester County was issued two months later on August 31, 1970. The circuit court concluded that the 1970 Wetlands Act did not affect the issues presented to it for determination because the subject property was located in Worcester County and Section 3 of the 1970 Wetlands Act provides that the provisions of the Act shall in no way affect the provisions of Sections 15A and 15B of the Code of Public Local Laws of Worcester County.[1]

---

1. Section 3 of Ch. 241 of the Acts of 1970.

Additionally, it should be noted that there was evidence introduced before the chancellor that the practice of reclaiming lands from the navigable waters of Maryland is one of long standing and wide application. In the Ocean City area substantial portions of the land west of Philadelphia Avenue (Coastal Highway) are filled. In Crisfield, Maryland, Somers Cove Marina and a public housing project are on reclaimed land. This appears also to be true of the City Dock and hospital areas in Cambridge, Maryland, and the Spa Creek and Bay Ridge areas near Annapolis and various unidentified areas adjacent to Baltimore Harbor, which latter situation will be discussed later in this opinion.

The following is an accurate summary of the declarations made in the order of the circuit court as set forth in the State's brief:

> "1. That Larmar has the right and privilege to reclaim land in front of the Hoddinott-Richards Property; that the property could be extended into the waters of Isle of Wight Bay until it reaches the established bulkhead line as described in Section 15A of the Code of Public Local Laws of Worcester County, Maryland; and that the extension could be made by filling the waters of the Bay with the dumping of soil or by obtaining fill materials from the bottom of the Bay between the bulkhead line and the borrow area limit line as described in Section 15A of the Code of Public Local Laws of Worcester County.

> "2. That Larmar need pay no compensation to the State of Maryland for materials obtained within the borrow area limit line or for the use of the bottom of the Isle of Wight Bay within the prescribed bulkhead line.

> "3. That the rights and privileges declared in paragraphs 1 and 2 are limited by the necessity for Larmar to make proper application and

secure proper approval for the exercise of such rights from the Worcester County Shoreline Commission.

"4. That Chapters 757 and 690 of the Acts of 1965 and Chapter 405 of the Acts of 1968, now codified as Sections 15A and 15B of the Code of Public Local Laws of Worcester County, Maryland are constitutional and valid legislative enactments.

"5. [Not pertinent to the decision in this appeal.]

"6. That title to so much of the Hoddinott-Richards Property as was "filled" in 1964 is vested in fee in Larmar to the same extent as title to the original upland may be vested in Larmar, such title not now being subject to the right or claim by the State of Maryland or any person, firm or corporation, except to the extent that the original uplands may have been subject to such right or claim.

"7. That title to any reclaimed land on the Hoddinott-Richards Property in 1964 and any land that may be reclaimed consistent with the circuit court's opinion may be freely encumbered and alienated by Larmar either as a part of, or separate from, the title to the original upland.

"8. That the regulation of riparian rights by Sections 15A and 15B of the Code of Public Laws of Worcester County, Maryland does not entitle Larmar to any compensation for the curtailment of any quasi-property rights which it might have had and enjoyed for such 'riparian rights' prior to the enactment of such rights.

"9. That the costs of the proceeding be paid equally by Larmar, The Board of Public Works of Maryland, The Maryland Water Resources Commission, and The Worcester County Shoreline Commission.

It should be noted at this juncture of this opinion that declarations numbered 4 and 8 were not challenged on appeal by the cross-appellants and therefore will not be specifically considered as an issue now before this Court. We are of the opinion, as we shall develop, regrettably at length, that the lower court should be affirmed as to its declaration numbered 6, that it was in error as to declaration numbered 2, and that declarations numbered 1, 3 and 7 and 9 should be modified as hereinafter delineated.

### History of Riparian Rights

One is seldom more impressed with Maryland's colonial ties than when provided with the tether of historical tracing of the property rights of riparian owners. A base point from which to begin is found in our most recent restatement of one of our more ancient concepts:

> "* * * The lands in Maryland covered by water were granted to the Lord Proprietor by Section 4 of the Charter from King Charles I to Caecillius Calvert, Baron of Baltimore, his heirs, successors and assigns, who had the power to dispose of such lands, subject to the public rights of fishing and navigation. *Brown v. Kennedy*, 5 H. & J. 195 (1821). By virtue of Art. 5 of the Declaration of Rights in the Maryland Constitution, the inhabitants of Maryland became entitled to all property derived from and under the Charter and thereafter the State of Maryland had the same title to, and rights in, such lands under water as the Lord Proprietor had previously held. These lands were held by the State for the benefit of the inhabitants of Maryland and this holding is of a general fiduciary character." *Kerpelman v. Board of Public Works*, 261 Md. 436, 276 A. 2d 56 (1971).

See also *Sollers v. Sollers*, 77 Md. 148, 151-152, 26 A. 188

(1892); *Hawkins Point Light-House Case,* 39 Fed. 77, 79-80 (C.C.D. Md. 1889); *Gould on Waters,* §§ 32, 42 (3rd Ed. 1900).

There is no need to review with particularity the cases defining the rights of a riparian owner at common law as our interpretation of the law for the purposes of this case must be based on the construction given to modern statutes. It suffices to note:

> "By the common law it is well settled, that where land lies adjacent or contiguous to a navigable river, in which there is an ebb and flow of the tide, any increase of soil formed by the gradual and imperceptible recession of the waters, or any gain by the gradual and imperceptible formation of what is called alluvion, from the action of the water in washing it against the fast land of the shore, and there becoming fixed as part of the land itself, shall belong to the proprietor of the adjacent or contiguous land. 2 Bl. Com. 261; *Giraud v. Hughes,* 1 G. & J. 249. And the right to accretion, thus formed, is considered as an interest appurtenant to the principal land, and belonging, in the nature of an incident, to the ownership of that, rather than as something acquired by prescription or possession, in the ordinary legal sense of those terms." *B. & O. R. R. Co. v. Chase,* 43 Md. 23, 34-35 (1875).

In assessing the changes which have occurred in riparian rights down the corridor of years it is well to keep in mind an appreciation for the basic rationale behind the rule of law which gave to the riparian owner the rights to land surfacing through the process of accretion or reliction. In its nascency, the sole purpose of the rule was to assure to the riparian owner that he would never be cut off from his access to water. If an in-

tervening party were permitted to gain title to accretions or to land exposed by the subsidence of water, the riparian landowner would be deprived of his valuable water-access rights.

The first substantial change in riparian rights in Maryland occurred in our colonial period when they were enlarged in specific areas by the enactment of the Act of 1745. Judging the Act of 1745 at its moment in history it becomes apparent that, as was stated by Alvey, C. J. in *B. and O. R. R. Co. v. Chase, supra*:

> "By the Act of 1745, ch. 9, sec. 10, which was a supplement to the Act incorporating Baltimore Town, it was provided that 'All improvements of what kind soever, either wharves, houses or other buildings that have been or shall be made out of the water, or where it usually flows, (as an encouragement for such improvers) shall be forever deemed the right, title and inheritance of such improvers, their heirs and assigns forever.' " 43 Md. at 32-33.

This Act of 1745 was obviously passed to accommodate the growing pains of a burgeoning colony as a prelude to the state and nation to be. Environmental factors and ecological balances were not yet the concern of the people of this new land. Their concern was the building of a bustling port on the eastern seaboard to support westward expansion of population and commerce. A similar right was given to the property owners of the town of Port Deposit on the Susquehanna River by the Act of 1824. See *Tome Institute v. Crothers,* 87 Md. 569, 40 A. 261 (1898).[2]

---

2. It is interesting to note that the 1824 Act pertaining to Port Deposit contained express permission to the property owner to improve his property by extending into navigable waters without restriction, the statute stating:

"That each and every of the proprietors of lots binding on and entitled to the privileges of the water in said village, shall be, and are hereby permitted to wharf out, extend and improve the whole front of their several lots re-

In 1860 the General Assembly repealed the Act of 1745 by a new codification of Maryland Laws which, with regard to riparian owners, restated a modified version of Ch. 168 of the Laws of 1835, which had provided for the construction of wharves on the navigable waters of the State. See Power, *Chesapeake Bay in Legal Perspective,* U. S. Dept. of Interior (1970), p. 97. The act to which we now direct attention, and which is vital to several of the issues resolved in the court below, is the Act of 1862. Chapter 129 of the Acts of 1862 (which at the time of the institution of this action was codified as Maryland Code (1968 Repl. Vol.), Art. 54, §§ 45, 46 and 48), provided:

> "*Whereas,* Doubts are entertained in regard to the extent of the rights of proprietors bounding on navigable waters, to accretions to said land, and to extend improvements into said waters; for the purposes of solving such doubts, therefore,
>
> * * *
>
> "[Sec. 45] The proprietor of land bounding on any of the navigable waters of this State, is hereby declared to be entitled to all accretions to said land by the recession of said water, whether heretofore or hereafter formed or made by natural causes or otherwise, in like manner and to like extent as such right may or can be claimed by the proprietor of land bounding on water not navigable.
>
> "[Sec. 46] The proprietor of land bounding on any of the navigable waters of this State, is hereby declared to be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements,

---

spectively, and for such distance, as from time to time, they may think fit." See 87 Md. 569, 584.

In striking contrast, as was pointed out by the appellants in their brief, neither the Act of 1745 nor the Act of 1862 contains any comparable language.

and other accretions as above provided for, shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made.

"[Sec. 48] No patent hereafter issued out of the Land Office shall impair or affect the rights of riparian proprietors, as explained and declared in the two sections next preceding this section, and no patent shall hereafter issue for land covered by navigable waters."

### Riparian Rights Under the Act of 1862

A reading of the statutory language makes it apparent that the Act of 1862 enlarged the rights enjoyed by the riparian owner at common law and at the same time by Section 48 (Sec. 39 in the original Act) gave added protection to his shoreline interests by prohibiting the issuance of patents to submerged lands covered by navigable waters. *Owen v. Hubbard*, 260 Md. 146, 161, 271 A. 2d 672 (1970) ; *Melvin v. Schlessinger*, 138 Md. 337, 343, 113 A. 875 (1921). Cf. *Baltimore v. Canton Co.*, 186 Md. 618, 625, 47 A. 2d 775 (1946).[3] However, the extent to which this Act enlarged the riparian owners' common law rights is the central question in this case. There have been a plethora of cases defining various aspects of these rights but not without some attending confusion.

The difficulties encountered by Section 45 (Sec. 37 in the original Act) of the Act of 1862 are well summarized by the following quotation from the excellent comment titled, *Maryland's Wetlands: The Legal Quagmire*, S.M. Salsbury, found in the Maryland Law Review :

"The language and legislative intent of sec-

---

3. In *Baltimore v. Canton Co.*, 186 Md. 618, 625, 47 A. 2d 775 (1946), Judge Markell states, "The rights of riparian owners subject to such government regulation, were reaffirmed in the Act of 1784, supra. Under the Act of 1862 such rights are substantially the same as under the Act of 1745 * * *."

tion 45 is as confusing as the conflicting interpretations that have been given it. The section entitles riparian landowners 'to all accretions to said land by the recession of said waters,' a phrase which is technically inaccurate since it confuses accretion, which is a gradual and imperceptible build-up of soil deposits on the shore, with reliction, which is an exposure of submerged land by the retrocession of the water. Further ambiguities arise from the wording 'accretion * * * made by natural causes or otherwise.' Since at common law accretions could only be formed by natural causes, [*Linthicum v. Coan,* 64 Md. 439, 450-452 (1886)] it is unclear what accretions 'made * * * otherwise are. Particularly troublesome is the question of whether land reclaimed by filling comes within the purview of accretions 'made * * * otherwise.' " 30 Md.L.Rev. 240 at 247.

It would appear that artificial fill, in the sense that the fill material is brought over riparian land by mechanical means and dumped into the water or dredged up from the bottom of the sea and placed in front of riparian properties so as to create new fast land, was not within the established meaning of accretion, as it was known at common law. See *U.S. v. 222.0 Acres of Land,* 306 F. Supp. 138, 151 (D. Md. 1969) ; See *Tome Institute v. Crothers,* supra, at 584; 56 Am. Jur., *Waters,* § 486.

All parties to this appeal devoted much of their briefs to the question of whether the term "or otherwise" contained in the language of Section 45 of the Act of 1862, providing for 'accretion * * * made by natural causes or otherwise,' " meant a build-up of the land exclusively by natural causes or whether it included artificial land fill. Larmar and Adkins contend that it includes the right to make and hold new fast land offshore by artificial landfill relying upon *Goodsell v. Lawson,* 42 Md. 348 (1875) as their most solid authority and also citing *Causey v.*

*Gray,* 250 Md. 380, 243 A. 2d 575 (1968); *Baltimore v. Canton Co., supra* at 625; *Hodson v. Nelson,* 122 Md. 330, 337-341, 89 A. 934 (1914) and *West. Md. T. R. Co. v. Baltimore,* 106 Md. 561, 565, 566, 68 A. 6 (1907). They further contend that the Act of 1862 was a state-wide act expanding the purposes of the Act of 1745, which latter act pertained only to the Town of Baltimore. The thrust of the Larmar-Adkins' argument is that the practical and administrative interpretation of the Act of 1862 for over 100 years permitted the riparian owner to make artificial landfill into navigable waters and construct improvements thereon, according to his own purpose and desire, subject only to the right of navigation and valid regulation (such as permission from the United States Army Corps of Engineers).

The State agencies on the other hand contend that the Act of 1745 was passed to fulfill a need peculiar at that time to the Town of Baltimore, and that the recognized need of a thriving port and the necessity to fill in insect-infested marshes prompted the Legislature to encourage land fill and wharfing out by the riparian owner. The State agencies further contend that the Act of 1766 not only permitted an owner to fill the land, but actually required him to do so by providing that the riparian owner should, within one month after the end of the session of the General Assembly in which the law was passed, give bond with approved surety, that within two years he would abate the nuisance "by wharfing in all marshy ground next to the water, and should also cover all such marshy ground with stones, gravel, sand, or dirt, so as to raise the same not less than two feet above the level of common flood tides." It was further directed that the reclaimed land be laid out into streets and lots. Chapter 22, Acts of 1766; *The Wharf Case,* 3 Bland 361 (1831). See also *Wilson v. Inloes,* 11 G. & J. 351 (1840). In short, the State agencies do not view the Act of 1745 as the progenitor of the Act of 1862.

With regard to the Act of 1862, the State relies pri-

marily on *Hess v. Muir,* 65 Md. 586, 5 A. 540 (1886) wherein the Court stated: "Farming and commercial interests are promoted by the privilege [of constructing improvements into the water] and to encourage the development of these was the main object of conferring it." 65 Md. at 598. (Chief Judge Alvey would appear to give a broader interpretation of the Act of 1862 in his concurring opinion.) Hence, the State argues that even if it were conceded that under the Act of 1862, the riparian owner could, at will, fill in the waters offshore, subject only to the requirement that he not obstruct navigation, such reclamation was restricted to that which was necessary for farming or commerce for the enjoyment of the particular land in question, i.e., to the extent that filling the land was necessary to enable the riparan owner to till the soil, fish, and to ship products of the land and water. The State agencies hotly contend that the Legislature, in passing the Act of 1862, never intended that the riparian owner should have the right to make extensive land reclamation into navigable waters for the sole purpose of development of real estate lots for sale. In point of fact the State relies heavily on 50 *Opinions Attorney General,* 452 (1965), wherein the conclusion was reached that:

> "The picture we draw of reclamation which a Maryland tidewater riparian owner has the unfettered right to accomplish as a statutory improvement shows small areas filled up in connection with wharfing out for the purpose of improving the riparian's own commercial access to deep water. A made-land housing development has nothing in common with this picture." 50 *Op. Atty. Gen.* at 468.

Professor Power in his able work, *Chesapeake Bay In Legal Perspective, supra,* at 101, while acknowledging 50 *Opinions Attorney General,* 452 (1965) to be persuasive, opines that it is in error and puts it down as "a conservationist's brief." A fair summary of his conclusion as to

the rights of a riparian owner is found on pages 100-101 of the aforementioned work:

"The language used in Section 45 and 46 [Act of 1862] would seem to be broad enough to embrace artificial landfill projects. Section 45 provides that owners of land bounding on navigable waters shall have the same rights to accretions by virtue of recession of waters from either natural causes or 'otherwise,' as do owners of land bounding on non-navigable streams. Since it had been resolved prior to 1862 that owners of land bounding on non-navigable waters were entitled to accretions, the apparent intent of the statute was to give navigable riparian owners on navigable waters the same rights. Although the syntax of Section 45 leaves something to be desired, that natural increases in the shoreline (accretions) be treated interchangeably with man-made increases appears to have been intended. This construction is buttressed by the language of Section 46, which lumps together 'improvements' with 'other accretions' and provides that they shall all belong to the abutting riparian land owners.

"Historical considerations seem also to support the right of the riparian owner to fill lands adjacent to his property. The earliest progenitor of Section 46 gave riparians in Baltimore City the right to make 'improvements,' 'as an encouragement to such improver.' [Laws, Ch. 9, Acts of 1745] The response to this authorization, which was not repealed until 1860, was so enthusiastic that the shape of the harbor was changed from a concave figure to a rectangular figure. [*Baltimore v. Canton Co.,* 168 Md. 618, 47 A. 2d 775 (1946)] Against this backdrop it appears likely that when the General Assembly in 1862 (over two years after repeal of the Act of 1745 statute) used the identical word, 'im-

provements,' it intended that riparians throughout the state have similar privileges.

"Cases decided under the 1745 statute uniformly recognized that riparian owners had the power to fill [*B. & O. R. R. Co. v. Chase,* 43 Md. 23, 33-34 (1875)] subject only to the regulatory power vested in Baltimore City to protect navigation. Dicta in various cases decided under the 1862 statutes recognize the right of riparians to fill and acquire title to the land created, and the one case dealing with artificial landfill under the 1862 statutes acknowledges the rights of the abutting riparian. [*Goodsell v. Lawson,* 42 Md. 348 (1875)]." *Chesapeake Bay In Legal Perspective,* U. S. Dept. of Interior (1970) at 100-101.

After a thorough review of the many cases and authorities cited in the ably prepared briefs submitted by all parties we have come to the conclusion that the riparian owner under the Act of 1862 had the right to make artificial landfill in navigable waters in front of his shore, limited only to the extent that he could not obstruct navigation. This is a decision hard to come by, particularly in view of the circumstance that the writer of this opinion for the Court was Attorney General of the State at the time of the publication of the opinion espousing a contrary conclusion, 50 *Opinions Attorney General,* 452 (1965). Realizing the inconsistency of the position now taken six years later, the words of Lord Eldon come to mind. He, finding himself in a similar situation, stated: "I feel myself bound to state that I must, when I decided that case, have seen it in a point of view, in which, after most laborious consideration, I cannot see it now." *Ex parte Nolte,* 2 Glynn & Jam. 295, 307-308 (1826).

### Title to Improvements

All parties to this appeal appear to recognize the weight which *Goodsell v. Lawson, supra,* brings to any consideration of the rights of the riparian owner in Maryland.

Accordingly, we think a resume of its facts and pertinent law to be in order. In *Goodsell,* the plaintiffs owned riparian land in Somerset County under an 1858 patent of "Honesty," some lines of which coincided with the shore of the navigable Annamessex River. They laid out their lands as the Town of Crisfield, "with the contiguous water, which it was proposed to use in connection with the land." In 1867 they leased an area under water in front of their shore to the defendant for 10 years for the conducting of an oyster business. The lease required the defendant to deposit the oyster shells resulting from his business "in the water on said premises, so as to fill up the same, and reclaim it for building and other purposes, * * *." After defendant lessee performed this covenant, he sought a patent for the (artificially) filled land. It was held that he was not entitled to the patent, that the plaintiffs as riparian owners had the exclusive right to fill out from shore under the Act of 1862 and that the "improvements" thus made by their tenant became their property.

The Court in its opinion stated:

> "But the rights of the appellees do not rest alone upon this ground. By the Code, Art. 54, sec. 38, there is secured to them as riparian proprietors, the exclusive right of making improvements into the waters in front of their lands, and such improvements when made belong to them as incident to their estate. This is a valuable right which other persons cannot lawfully destroy or interfere with. Where such rights existed under the Acts of 1745 and 1784, it has been held that no patent ought to be issued for the land covered by water, in front of the property of the riparian proprietor, so as to interfere with its prospective enjoyment by him; and this was decided before the passage of the Act of 1861-62. *Chapman v. Hoskins,* 2 Md. Ch. 485, approved in *Patterson v. Gelston,* 23 Md. 448. In the exercise of this right of improvement, the

46

riparian proprietor is not restricted except by
the provision, 'that the improvements so made
shall not interfere with the navigation of the
stream of water, into which the said improve-
ment is made.' Code, Art. 54, sec. 38." 42 Md.
348, 371-2.

It would appear that there is no dispute among the
parties over the proposition that "under the Act of 1745
—or 1862—'the riparian had no vested title to the land
covered by water immediately in front of his property,
nor to the improvements built out of the water, *until the
improvements had been actually completed Giraud's Les-
see v. Hughes*, 1 Gill and J. 249 [1829].' * * *." (Empha-
sis supplied.) *Baltimore v. Canton Co., supra,* at 625. And
in *Causey v. Gray, supra,* we said: "When the lot owner
makes improvements in front of his lot, complete title
vests in him in the improvements provided it is in front
of his lot * * *." See also *Owen v. Hubbard, supra; Ca-
hill v. Baltimore,* 173 Md. 450, 456, 196 A. 305 (1938) ;
*Melvin v. Schlessinger,* 138 Md. 337, 343, 113 A. 875
(1921) ; *Hodson v. Nelson, supra,* 337-338; *Western
Maryland T. R. Co. v. Baltimore, supra* at 567; *Hess v
Muir, supra* at 596; *Goodsell v. Lawson, supra* at 371.

### State Ownership of Submerged Land

There is no question but that the waters of Isle of
Wight Bay and the land under them are the property of
the State. *Kerpelman v. Board of Public Works, supra;
Brown v. Kennedy,* 5 H. & J. 195 (1821). Navigable wa-
ter and the land thereunder have always been a part
of the public domain. There is a distinction, however, in
the type of ownership of the two. Since the Magna Charta
granted by King John to the Barons at Runnymede on
June 15, 1215, the public has had an interest in the navi-
gable stream such as the rights of fishery and naviga-
tion, which cannot be abridged or restrained by charter
or grant. *Bruce v. Director, Dept. of Chesapeake Bay Af-
fairs,* 261 Md. 585, 276 A. 2d 200 (1971). No exclusive
use of the water may be granted; however, the property

in submerged land can be transferred by grant. It was owned by the King of England and he had the right to dispose of it, which he did by the fourth section of the charter to Lord Baltimore. *Brown v. Kennedy, supra.* See also *Martin v. Waddell,* 41 U. S. 367 (1842).

After the Revolution all lands which had belonged to the Lord Proprietary became absolutely vested in the State and were held for the public benefit; "* * * [N]ot, however, as under the government of the province, as the estate and for the private emolument of an individual, but for the use of the public * * *." *Baltimore v. McKim,* 3 Bland, 453, 460 (1831). It is well established that the title of land below the high water mark, as well as rivers or streams within the ebb and flow of the tide, belong to the public. *Day v. Day,* 222 Md. 530, 537 (1865); *Causey v. Gray, supra,* at 387; and *West. Md. T. R. Co. v. Baltimore, supra,* at 567.

For some 200 years, until 1862, the State (and the Proprietor) patented to individuals, subject to the public rights to navigation and fishery, fee simple title to lands under navigable waters. *Bowie v. Western Md. R. R. Ter. Co.,* 133 Md. 1, 7, 104 A. 461 (1918). The reported cases in this Court show instances of such patents as early as 1663 (*Casey v. Inloes,* 1 Gill 430) and as late as 1861 (*Linthicum v. Coan,* 64 Md. 439). However, it would appear that this Court has at times had a second thought concerning the issuing of such patents, as was pointed out in the opinion of this Court written by Judge Smith in *Van Ruymbeke v. Patapsco Industrial Park,* 261 Md. 470, 276 A. 2d 61 (1971):

> "There is authority in Maryland for the rejection of an under-water patent. In *Day v. Day,* 22 Md. 530 (1865), there was an application for a patent prior to 1862. The land was underwater. Before the passage of the Act of 1862 the Commissioner of the Land Office granted the patent, overruling the caveat. The appeal reached our predecessors after the passage of the 1862 Act. The Court said:

'* * * Rivers or streams within the ebb and flow of tide, to high water mark, belong to the public, and in that sense are navigable waters; all the land below high water mark, being as much a part of the *jus publicum*, as the stream itself. The owners of adjacent ground had no exclusive right to such lands, nor could any exclusive right to their use be acquired, otherwise than by an express grant from the State. The Act of 1862 was intended to vest these owners of contiguous lands with rights and privileges not recognized by the Common Law, and to that end, the 1st section declares,—that the proprietor of land bounding on any of the navigable waters of the State, should be entitled to all accretions thereto by the recession of water, whether before thereafter formed or made, by natural causes or thereafter formed or made, by natural causes or otherwise.' Id. at 537.

"The Court went on to hold that the patent should not issue. In *Patterson v. Gelston*, 23 Md. 432 (1865), after first citing *Day*, the Court said:

'Upon the principles decided by the late chancellor, in *Chapman v. Hoskins*, 2 Md. Ch. 485 [(1851)], to which we give our entire approbation, no patent ought to be granted for land so situated, even though the power of the State to grant such patent might be unquestionable, and the Act of 1861-1862 had not been passed.' Id. at 448." 261 Md. 476-477.

Related to the proposition that the ownership of land under navigable waters was originally vested in the sovereign is the collateral question of whether the right which the riparian owner has to fill or wharf out is a property right or a license. As Professor Power has pointed out in his work, *Chesapeake Bay In Legal Perspective*, the status accorded riparian rights as an inci-

dent to the ownership of contiguous land creates the strong implication that it is a property right rather than a license. However, our reading of the Maryland cases would indicate that there have certainly been occasions when this Court has taken an ambivalent approach to this issue and while terming the right a property right has viewed it as a quasi-property right, a license or a franchise which exists at the grace of our Legislature. In *B. & O. R. R. v. Chase, supra,* this Court identified riparian rights as a property right but one that was subject to modification and change by the Legislature, stating:

> "These riparian rights, founded on the common law, are property, and are valuable, and while they must be enjoyed in due subjection to the rights of the public, they cannot be arbitrarily or capriciously destroyed or impaired. They are rights of which, when once vested, the owner can only be deprived in accordance with the law of the land, and, if necessary that they be taken for public use, upon due compensation. *Yates v. Milwaukee,* 10 Wall. 504. It is in view of these principles that the present action is sought to be maintained. *But these principles of the common law, governing the rights of the riparian owner, however well established, are subject to change and modification by the statute law of the State,* and by the nature and circumstances of the grant by which the title may have been acquired to the land bounding on the river." 43 Md. at 35-36. (Emphasis supplied.)

Again in *Baltimore v. Canton Co., supra,* the Court stated:

> "* * * We shall assume, without deciding, that Section 48 [Act of 1862] could be repealed, and also Section 47 to the extent that improvements had not actually been made. [Indeed, the Wetlands Act of 1970 does just that.]

"Under the Act of 1745—or 1862—'the riparian owner had no vested title to the land covered by water immediately in front of his property, nor to the improvements built out of the water, until the improvements had been actually completed * * *. The required consent of the city agencies was given by the establishment of limiting lines. The power to establish such a line includes power to change it. The right to build piers to a particular pierhead line, conferred by an ordinance of 1880, 'was a privilege subject to revocation at any time before it was acted upon, and the ordinance of 1881, which repealed all ordinances inconsistent therewith [and established a new line], was a revocation of this privilege.' *Classen v. Chesapeake Guano Co.*, 81 Md. 258, 267, 31 A. 808, 809; *Cahill v. Mayor and City Council of Baltimore, supra,* 173 Md. 456, 457, 196 A. 305.

"Subject to such governmental regulation by the city (and by the federal government), the riparian owner's right to make improvements in the water was 'a franchise; a vested right peculiar in its nature; a *quasi* property, of which [he] could not lawfully be deprived, without [his] consent.'" 186 Md. at 625-626.

Indeed, it would appear that a valid distinction may be drawn between "used" and "unused" riparian rights and "* * * it appears that the constitutional protection given judge-made riparian rights may extend only to such rights as the riparian actually exercises before the Legislature decides to make changes or modification." *Chesapeake Bay In Legal Perspective, supra,* at 148. It is against this background that we come to the consideration of the legal effects of the 1970 Wetlands Act and §§ 15A and 15B of the Public Local Laws of Worcester County, which established the Worcester County Shoreline Commission, on the rights of the riparian owner, Larmar.

### The Wetlands Act of 1970 and Sections 15A and 15B of the Public Local Laws of Worcester County

The Wetlands Act of 1970 is a comprehensive act which makes the first substantial changes in the rights granted to riparian owners in over 100 years. It repeals Sections 45, 46 and 47 of the long standing Act of 1862, which as we have heretofore seen was the wellspring of riparian rights during the past century. In addition, it repealed Section 485 of Article 27 of the Maryland Code which controlled the right to "dig, dredge, take and carry away sand, gravel or other materials from the bed of rivers, creeks, or branches" of navigable waters. The repeal of these statutes by the Legislature was unqualified and thus applies to every county and every body of navigable water in the State.

Section 1 of the Act (Ch. 241 of the Acts of 1970) added new sections 718 through 731 to Article 66C. Section 3 of the Act specifically provides that it "shall in no way affect the provisions of §§ 15A and 15B of the Public Local Laws of Worcester County." [4] It should be noted, however, that there is no express language stating that the Wetlands Act of 1970 should not apply to Worcester County. Additionally, we would note that the sweeping concept of the language found in section 1 of the Act leaves little doubt but that the Legislature intended it to have state-wide application:

> "It is declared that in many areas of the State much of the wetlands have been lost or despoiled by unregulated dredging, dumping, filling, and like activities, and that the remaining wetlands of this State are in jeopardy of being lost or despoiled by these and other activities; that such loss or despoliation will adversely affect, if not

---

4. Section 15A delineates by courses and distances the bulkhead line and the fill or borrow line in the Isle of Wight Bay and Assawoman Bay in Worcester County and Section 15B is intended to give control of filling and dredging activities on both State and private wetlands in Worcester County to the Worcester County Shoreline Commission.

entirely eliminate, the value of such wetlands as sources of nutrients to finfish, crustacea and shellfish of significant economic value; that such loss or despoliation will destroy such wetlands as habitats for plants and animals of significant economic value and will eliminate or substantially reduce marine commerce, recreation and aesthetic enjoyment; and that such loss or despoliation will, in most cases disturb the natural ability of tidal wetlands to reduce flood damage and adversely affect the public health and welfare; that such loss or despoliation will substantially reduce the capacity of such wetlands to absorb silt and will thus result in the increased silting of channels and harbor areas to the detriment of free navigation. Therefore, it is declared to be the public policy of this State, taking into account varying ecological, economic, developmental, recreational and aesthetic values, to preserve the wetlands and to prevent the despoliation and destruction thereof."

We think it would be of particular importance to a riparian owner of Worcester County (now that the reclamation and wharfing privileges formerly granted by the Act of 1862 and the dredging privileges contained in Article 27, § 485 have been unqualifiedly repealed) that he have the benefit of the rights assured to riparian owners by Section 720 of the Wetlands Act of 1970 (Art. 66C). We do not think the Legislature intended that the property owner on navigable waters anywhere in Worcester County be deprived of the benefits of Section 720 of the new Act which provides among other benefits that:

"The owner of land bounding on navigable waters shall be entitled to all natural accretions to said land and to make improvements into the waters in front of said land for the purposes of preserving his access to navigable water or for protecting his shore against erosion. After an

improvement has been constructed, it shall become the property of the owner of the land to which it is attached. None of the rights covered under this subheading shall exclude the owner from developing other uses as approved by the Board of Public Works."

Larmar and Adkins argue that although the Wetlands Act of 1970 repeals Sections 45, 46, and 47 of the Act of 1862, that Sections 15A and 15B of the Public Local Law preserves to the riparian owner the right by permit to dredge and fill in the Isle of Wight Bay and Assawoman Bay and that Section 15B by implication gives the right to dredge and fill elsewhere in Worcester County upon permit and under the control of the Worcester County Shoreline Commission. However, it would appear to us that the rights assured to the riparian owner under Sections 15A and 15B are not as broad as those accorded the riparian owner under the Wetlands Act of 1970, particularly those set forth in the above quoted Section 720 of Article 66C.

There are a number of other provisions in the Act which logic dictates should apply on a state-wide basis and therefore to Worcester County. Summarized are some of the more significant provisions of the Act:

Section 721 makes it unlawful for any person to dredge or fill on any State wetlands unless he had a license issued by the Board of Public Works for such consideration, and according to such terms and conditions as it deems advisable. Certain exceptions are made for such things as the dredging of seafood products by licensed operators and the improvement of wildlife habitat or agricultural ditches. Section 721 also makes the Secretary of the Department of Natural Resources the State official charged with the responsibility of implementing and administering the Act. With respect to private wetlands he is empowered, under Section 722, to promulgate rules and regulations governing dredging, filling, removing, or otherwise altering or polluting private wetlands.

However, notwithstanding any rule or regulation promulgated by the Secretary for the protection of private wetlands, the owner of private wetlands is authorized under Section 723 to make the following uses of his lands:

"(1) Conservation of soil, vegetation, water, fish, shellfish, and wildlife.

(2) Trapping, hunting, fishing, and shellfishing where otherwise legally permitted.

(3) Exercise of riparian rights to make improvements to lands bounding on navigable waters to preserve access to such navigable waters or to protect the shore against erosion."

Section 724 directs the Secretary to make an inventory of all private wetlands within the State and to prepare wetlands boundary maps for each subdivision of the State. The Secretary is further directed to establish by order the bounds of such wetlands and the rules and regulations applicable thereto. Section 725 sets forth the procedure by which a person affected by the Secretary's rules and regulations can appeal to the board of review of the Department of Natural Resources, the Circuit Court and the Court of Appeals. Section 726 establishes the procedure for obtaining a permit by a person who proposes to conduct an activity upon a wetland which is not permitted by the Secretary's rules and regulations and Section 727 provides the guidelines, conditions and appeal provisions covering the Secretary's action in granting, denying or limiting a permit. Section 728 concerns appeals from the board of review of the Department of Natural Resources, Section 729 concerns court costs and Section 730 provides for fines, imprisonment and restoration of affected wetlands in the event that a person knowingly violates the rules and regulations promulgated by the Secretary or any provision in Sections 718-731 of Article 66C. Section 731, the last of the new sections of Article 66C, provides that no riparian owner shall be deprived of any rights of riparian ownership that he had

prior to July 1st, 1970, except as provided by §§ 718-731 of Article 66C.

We do not believe that it can be seriously argued that the limited provisions of §§ 15A and 15B of the Code of Public Local Laws of Worcester County can fill the vacuum left by the repeal of the Act of 1862 and Article 27, § 485. We think that the Legislature intended that a dual system should exist in Worcester County whereby the Public Local Law operates in concomitance with the Wetland Act of 1970. See 30 Md. L. Rev. 240 at 255, wherein it is stated: "This dual permit system appears desirable since it would allow local supervision of land reclamation projects as well as control by a panel of experts of State authorities who would evaluate the environmental repercussions of any dredging and filling." [5] In view of what we have stated we reach the conclusion that any land filling, reclamation, dredging or other alterations of the shoreline of Larmar, the riparian owner in this case, which has been undertaken or may be undertaken after July 1, 1970, the effective date of the Wetlands Act, requires compliance with the provisions of that Act. [6]

---

5. The following observations found in the minutes of the seventh meeting of the Natural Resources Subcommittee of the Economic Matters Committee of the Legislative Council, held in Ocean City, Maryland on August 13, 1969 is of interest in this regard:

"Mr. Ned Thomas, Attorney for the Shoreline Commission, commented that the multi-agency requirements were expensive and unnecessary and that legislations should be written to coordinate their activities. He added that there were some rumors that the authority of the Shoreline Commission was to be restricted. He stated that this was not advisable because local people as well as ecologists should have a say in land development in their area."

6. Section 721 of Art. 66C (The Wetlands Act of 1970) provides in part:

"* * * It shall be unlawful for any person to dredge or fill on State wetlands, except to the extent that he has been issued a license to do so by the Board of Public Works. * * * In order to aid the Board of Public Works in the determination of whether a license to dredge or fill State wetlands should be issued, the Secretary of Natural Resources, after consultation with interested federal, State and local agencies and appropriate agricultural agencies, and after taking of such evidence and holding of such hearings as the Secretary thinks advisable, shall submit a report indicating whether the license should be granted and, if so, the terms, conditions and consideration

*Payment of Compensation to State*

Having concluded that the Wetlands Act of 1970 applies to Worcester County we reach the question of whether the Board of Public Works may require compensation be paid to the State for materials obtained within the borrow area limit line or for the use of the bottom of the Isle of Wight Bay within the prescribed bulkhead line. Sections 15A and 15B of the Public Local Law are silent on this point. Larmar takes the position that for 220 years (1745-1965) extensive land filling has taken place in navigable waters throughout the State without the State asserting any right to compensation and that acquiescence in this practice is tacit admission that the State has no right to exact compensation. However, we would ascribe the State's failure to exact compensation for the removal of deposits from navigable water bottoms or for the dumping of fill on submerged land to a matter of policy, rather than to an absence of the right to do so. It is established beyond cavil that the State owns title to the submerged land under the navigable waters of the State. *Baltimore v. McKim, supra,* and *Brown v. Kennedy, supra,* and our predecessors in *Potomac Dredging Co. v. Smoot,* 108 Md. 54, 63-64, 69 A. 507 (1908), stated that at common law the riparian owner had no rights in offshore deposits, stating:

> "We have discussed this case upon the presumption, in favor of the plaintiff company, that the owner of the land bordering on Moxley farm could, at the date of the lease from Boswell to Cameron, grant the right to take sand and gravel from the water front or shore of his land below high water mark. *At common law the owner of*

---

which should be required. The Board of Public Works after a hearing in the local subdivision affected shall then decide if issuance of the license is in the best interests of the State, taking into account the varying ecological, economic, developmental, recreational and aesthetic values each application presents, and if it so decides, shall issue a license for such consideration, and according to such terms and conditions as it deems advisable."

*riparian land could not grant such a license.
Day v. Day,* 22 Md. 530, but under the Act of
1900, Ch. 577 it became lawful for owners of
land bordering on the Potomac River to do so
and by the Act of 1906, Ch. 426 [This act was
the forerunner of Art. 27, § 485] that power
was conferred upon owners of lands bordering
on any of the navigable rivers, creeks, or
branches of the State. * * *" (Emphasis sup-
plied.) 108 Md. 63-64.

As we have previously discussed, the Wetlands Act of
1970, among other things, repealed Article 27, § 485
which latter act gave to the riparian owner the right to
dredge and take materials from the bottom of navigable
rivers in front of his shoreline. Therefore, the riparian
owner is now in the same position as he was at common
law, except that he has resort to the provisions of the
Wetlands Act of 1970, which created the administrative
machinery whereby application may be made to the
Board of Public Works for a permit to dredge or fill on
State wetlands. Section 721 of Art. 66C (the Wetlands
Act of 1970) provides that after the Board of Public
Works has received a recommendation from the Secre-
tary of Natural Resources regarding the requested per-
mit, it shall hold a hearing in the local subdivision af-
fected and:

"* * * shall then decide if issuance of the li-
cense is in the best interests of the State, tak-
ing into account the varying ecological, eco-
nomic, developmental, recreational and aesthetic
values each application presents, and if it so de-
cides, *shall issue a license for such consideration,
and according to such terms and conditions as
it deems advisable.*" (Emphasis supplied.)

We think under this last quoted provision of Section
721 of the Act that the Board of Public Works clearly
has the authority to exact the consideration and surety
requirements for a license to dredge and fill as estab-

lished by the policy adopted in its meeting of August 1, 1968. We do not think it necessary to a decision in this case to view the Board of Public Works' authority retrospectively as of August 1, 1968, prior to the effective date of the Wetlands Act of 1970 (although we doubt that our conclusion would be different) as this element of the case is controlled by *Janda v. General Motors*, 237 Md. 161, 169, 205 A. 2d 228 (1964). In *Janda*, Judge Hammond (now Chief Judge) writing for the Court said:

> "A statute which affects or controls a matter still in [appellate] litigation when it became law will be applied by the court reviewing the case at the time the statute takes effect although it was not yet law when the decision appealed from was rendered, even if matters or claims of substance ( not constitutionally protected), as distinguished from matters procedural or those affecting the remedy are involved, unless the Legislature intended the contrary. See *Yorkdale Corp. v. Powell*, 237 Md. 121, and cases cited; see also *Day v. Day*, 22 Md. 530 (a patent to land covered by navigable waters, valid when issued by the Commissioner of Land Office was made invalid by a law passed during the pendency of the appeal; the Court of Appeals held the law applicable and controlling and reversed the issuance of the patent) ; * * *." 237 Md. at 169.

Larmar contends that the legal impact of the Wetlands Act of 1970 on this case was not before the lower court and hence cannot be considered on appeal, citing Maryland Rule 885. However, Judge Prettyman in his opinion did refer to the Wetlands Act of 1970 and the learned Judge made it abundantly clear that, in his opinion, the 1970 Act did not apply to Worcester County. On the basis of *Janda,. supra*, as well as the fact that Judge Prettyman passed upon its applicability to Worcester County, we think the effect of the Wetlands Act of 1970

upon this litigation is quite properly an issue before this Court.

Further support for the proposition that the Board of Public Works has a right (if not a duty) to require consideration for a license to dredge and fill on State wetlands may be found in Code (1969 Repl. Vol.) Art. 78A, § 15, wherein it is stated in pertinent part:

> "* * * Any real or personal property of the State of Maryland * * * may be sold, leased, transferred, exchanged, granted or otherwise disposed of * * * for a consideration adequate in the opinion of the Board of Public Works * * *. As used herein, the term 'real or personal property or any legal or equitable rights, interest, privileges, or easements in, to, or under the same' shall include the inland waters of the State and land under said waters * * *."

The statute also provides that the consideration may be currency or other property.

Finally, recapitulating the conclusions which we have reached as they affect the declarations made by the learned chancellor below and as developed in this opinion, we hold:

(1) That title to so much of the Hoddinott-Richards Property as was "filled" and reclaimed in 1964 vested, in fee, in Larmar Corporation, to the same extent as title to the original upland may be vested in the Larmar Corporation, such title not now being subject to any right or claim by the State of Maryland, or any other person, firm or corporation, except to the extent that the original uplands may have been subject to such right or claim (This holding corresponds with declaration numbered 6 set forth in the opinion of the court below) ; and

(2) That any future reclamation of the land in front of Hoddinott-Richards Property to the west into the waters of the Isle of Wight Bay must be accomplished in compliance with the Wetlands Act of 1970 (Code (1970 Repl. Vol.), Art. 66C, § 718 through 731) and Sections

15A and 15B of the Public Local Laws of Worcester County (This holding modifies declarations numbered 1, 3, and 7 of the declarations set forth in the opinion of the lower court) ; and

(3) That title to any reclaimed land on the Hoddinott-Richards Property in 1964 may be freely encumbered and alienated by Larmar either as a part of, or separate from, the title to the original upland (This holding modifies declaration numbered 7 set forth in the opinion of the court below.) ; and

(4) That the Board of Public Works has a right to require consideration for a license to dredge and fill on State wetlands as provided in the policy adopted by that Board on August 1, 1968 (This holding reversed declaration numbered 2 set forth in the opinion of the court below) ; and

(5) That the cost of the proceeding be paid equally by Larmar, the Board of Public Works of Maryland, and the Maryland Water Resources Commission (This holding modifies declaration numbered 9 set forth in the opinion of the court below).

> *Order affirmed in part, reversed in part and modified in part, and remanded for the passage of an order consistent with this opinion, costs to be paid equally by Larmar Corporation, the Board of Public Works, and the Maryland Water Resources Commission.*