## CARTER LEE BOWIE, TRUSTEE,

*vs.*

## WESTERN MARYLAND R. R. TERMINAL CO.

*Deeds: abutting on streets or navigable waters; middle of street or stream; Browne v. Kennedy, 5 H. & J. 195, affirmed. Ejectment: plea of "not guilty"; effect of—. Trustees: suits by—; costs. Streets: both sides assigned to same grantee; revocation of dedication.*

In general, in the absence of a statute regulating it, the extent to which the deed of an owner of land abutting on a street or stream goes, depends upon how far his title extends, unless he limits the conveyance by appropriate terms.    p. 11

A grant abutting on a stream or on tidewater will be held to carry all the land owned by the grantor, in the absence of anything to show an intention not to do so. If the grantor owns to the thread of the stream, the grantee will take to the middle of the stream.    p. 12

A deed conveying land "to tidewater" of a tidewater pond, and "then running and bounding on the water" of said pond, clearly conveys the rights of the grantor to the middle of the bed of the pond or stream. The grantee takes subservient to the rights of the public; the main advantage in having the title to the bed is to prevent the grantor from interfering with the grantee's use of it.    p. 12

Such rights of the grantee are very similar to those given to proprietors of land on navigable waters in this State by sections 47, 48 and 49 of Article 54 of the Public General Laws.
   p. 12

The case of *Browne* v. *Kennedy,* 5 H. & J. 195, is affirmed as the law of this State regarding questions of title to property bounding on navigable streams.                    p. 11

The conveyance of the bed of a street from its northerly terminus to its southerly terminus at a navigable tidewater pond is sufficient to carry whatever rights the grantor had in the bed of the pond in front of the street; when the street was laid out by the grantor Gould, "for the benefit of the purchasers on his ground fronting thereon," and the street went to "Herring Pond," the purchasers were intended to have the right to use that pond in any way not contrary to the rights of the public; and, as the appellee is the sole owner of the properties binding on it, the appellant would have no right to eject it from the pond, regardless of the question as to whether the dedication of said street had been revoked.                    p. 13

Where the title to both sides of a street and to the bed of the street is vested in the appellee, it was *held,* that, at least for the purposes of that case, the dedication, if any, must be treated as revoked; although, as the city is not a party to the cause, its rights, if any, are not to be understood as being affected by anything said in this opinion.                    p. 12

A plea of "not guilty" in ejectment not only puts in issue the title to the premises, but also the right of possession.        p. 13

Where a trustee brings his suit without first obtaining the approval of the equity court having jurisdiction of the trust, that court should determine whether he should be allowed to reimburse himself out of the trust funds for the costs that were found against him.                    p. 13

*Decided April 26th, 1918.*

Appeal from the Superior Court of Baltimore City. (STANTON, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, STOCKBRIDGE and CONSTABLE, JJ.

BOWIE vs. WESTERN MD. R. R. TER. CO.   3

Md.]                    Opinion of the Court.

*Alexander Preston* and *Frederick W. Story*, for the appellant.

*George R. Gaither* (with whom was *Geo. P. Bagby* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an action of ejectment brought by the appellant against the appellee in the Superior Court of Baltimore City for

"All that portion of Upton Court in the City of Baltimore which is described as follows, to wit: All that portion of the Herring Pond which lies to the east and north of the middle file thereof; from the southeastern outline of that part thereof heretofore on the sixth day of January, in the year eighteen hundred and fifty-nine (by deed now recorded among the Land Records of Baltimore City in Liber G. E. S. No. 162, folio 413, etc.), conveyed by Alexander Gould to Thomas Winans; southerly and then easterly to and into the northwest branch of the Patapsco River."

A plea of not guilty was filed and the case was tried before the Court, without a jury. The Court rejected the plaintiff's prayer and granted the defendant's third and fourth, which held that the plaintiff was not entitled to recover. The verdict was accordingly rendered for the defendant, and from a judgment entered thereon this appeal was taken.

A tract called "Upton Court," containing 500 acres, more or less, was patented on the 2nd of August, 1668, by Lord Baltimore to David Pool, which became vested in John Giles by deed on June 18, 1720. John Giles by his will proven in 1725 devised a part of his "dwelling plantation and land adjacent which is between a pond called Herring Pond and the Middle Pond," etc., to his wife for life, and after her death to his son John. He then devised part of that tract to his son John, and the remainder to his son Jacob. Before

John Giles (Sr.) died he had applied for a resurvey of said tract, but he died before it was patented, and on August 12th, 1731, a patent was issued to John Giles (Jr.).

The will of John Giles (Sr.) certainly leaves in grave doubt the question whether he intended to give his son John (whom for convenience we have designated in this opinion John Giles, Jr.) any, or, if some, what part of Herring Pond. The description of what he left to Jacob does not say whether the beginning was to be on the one side or the other of the mouth of Herring Pond, and if it must therefore begin in the center of the mouth there is nothing to show where the trees at the head of the pond stood—although, of course, the call would take the line to the trees. The rest of the will would seem to indicate that John was not to have any part of Herring Pond. The patent granted to him on the 12th of August, 1731, does not help, because by the deed made by him to Jacob February 28, 1732, he undertook to convey to Jacob what was left him by their father's will.

Then the deed from Gerard Hopkins to Hugh Young, dated Nov. 20, 1778, is very indefinite. It began at a point *somewhere* "20 feet southeast from a poplar and two oak stumps formerly marked trees," etc. Apparently, or at least probably, they were the poplar, red oak and "water oak" referred to in the will of John Giles (Sr.) at the head of Herring Pond. The deed then calls to run to the Southwest Branch of Patapsco River; thence running and bounding on and with the said Branch by several lines given, and then "south 55 degrees west 11 perches to the mouth of a small branch called the Herring Pond, and running and bounding on and with the said pond west 10 perches," etc. The courses and distances of twelve other lines are then given, without any calls, and "then by a straight line to the beginning." Where the beginning was depends upon where the trees were, and then some point from which the trees were "at a distance of 20 feet southeast" would be adopted, but it will be observed that the call is to the mouth of Herring

Pond "and running and *bounding on and with* the said ponds." It is not "to the *south side* of the mouth of the said Herring Pond thence on and with the said Herring Pond" as in the partition deed between Sarah Hopkins and Elizabeth Webster of September 8, 1768. Upon what principle of construction or locations the call in the Hopkins-Young deed could be taken to the *south side* of the mouth of Herring Pond we do not understand. It may or may not have been a mistake, but it may have been that Hopkins had some such idea as the appellant attributes to Gould—that it would be well to hold on to this pond, although he sold his land abutting on it. Whatever the reason was, if the description set out at length in the record is correct, it did not take the grant to the south side of the mouth of the pond and hence did not convey any of the pond unless the home line—then by a straight line to the beginning—included some portion up about the head.

Inasmuch as Gould claimed through John Giles (Jr.) and Hugh Young, if Herring Pond was not conveyed by them or either of them, then Gould did not acquire it. As the record stands we can not see how the Court below, sitting as a jury, could have rendered a verdict for the plaintiff, and he would have been justified in declaring as a matter of law that under the proper construction of the Hopkins-Young deed the plaintiff could not recover. It is not in the record, but the appellee's brief states that it did offer a prayer that there was no legally sufficient evidence to entitle the plaintiff to recover and we think that could have been granted.

But as the lower Court relied on other grounds which must have assumed that title to the part of Herring Pond in controversy in this case became vested in Alexander Gould, we will further consider the case with that assumption, which makes it unnecessary to go beyond him. It may be well to add that the appellee does not deny that Gould had title to the land outside of the pond and claims that he conveyed whatever title he had to that pond, which has now become vested in it. If he never had any title in the bed of the

pond of course he can not maintain the action of ejectment for it, and any rights he had as riparian owner have undoubtedly passed out of him.

Alexander Gould and wife by deed dated the 24th day of January, 1853, conveyed to J. Washington Tyson two parcels of land which were parts of Upton Court, both of them being on the easterly side of Herring Pond. They were separated by a street 50 feet wide, which the deed says was "laid out by the said Gould for the benefit of the purchasers of his ground fronting thereon." The first parcel is described as beginning on the southeast side of that street (which in later deeds is called Gould street) at a point described, "and running thence bounding on the southeast side of said 50 foot street south 46 and 3 quarter degrees west 282 feet to the water of Herring Pond; then running and bounding on the water of Herring Pond the two following courses, viz. south 22 and a quarter—west 562 feet, north 85 degrees east 354 feet to the water of Patapsco River," etc. The second parcel begins on the northwest side of that street and calls to run, "to the water of Herring Pond, then running and bounding on the water of Herring Pond, south 12 and a half degrees east 120 feet to the northwest side of said 50 feet street." James R. Read, trustee, conveyed to William P. Twamley seven different properties, including one that is described as follows: "First all of the bed of Gould street 50 feet wide extending from its northerly terminus at the northeasternmost outline of the property formerly belonging to the estate of Alexander Gould, deceased, to its southerly terminus at the Herring Pond, a distance of about 1,800 feet." Twamley and wife subsequently conveyed the same property to the appellee, but we do not find the dates of either of those deeds in the record. The two parcels conveyed to Tyson by the above mentioned deed became vested in Thomas Winans by deed of April 25th, 1859, and subsequently the Winans interest became vested in the appellee.

We will first consider the effect of the deed from Gould to Tyson, for the two parcels of land. The appellant contends

that as the deed from Gould to Winans, dated January 6, 1859, expressly called to run to the margin and then to the center of Herring Pond, etc., it shows that it was not intended to so run by the deed from Gould to Tyson made six years before, but, that would be a violent presumption and inasmuch as Winans purchased the property acquired by Tyson a few months after he purchased the property from Gould, it is more likely that he thought that the Tyson property extended into the pond, if he thought anything about it.   Before Gould sold to Winans he had ample front on the pond for that property, after he had sold to Tyson, and it is difficult to see any possible use he could have made of it excepting in front of the property he retained until he sold it to Winans.

The case of *Browne* v. *Kennedy,* 5 H. & J. 195, seems to us to be conclusive of most of the questions.   Whatever the law was elsewhere that case settled it for this State, and has never been overruled or qualified.   It was there held that LORD BALTIMORE, a proprietor of Maryland, acquired the same right to dispose of land covered by navigable waters within the Province, under the charter granted to him by the King, as the King had prior to granting the charter—subject to the right of the public to use it for fishing and navigation. The right to grant land covered by navigable waters afterwards became vested in the State—subject to the same restrictions.   In June, 1700, a tract of land called Todd's Range, being a resurvey of Cole's Harbor, was granted to James Todd.   The courses and distances included Jones' Falls and at the time of the grant, and until 1786, the ordinary tides flowed up Jones' Falls to a place marked on the plat and boats went to that place until 1787.   By mesne conveyances and devises the tract called Todd's Range became vested in Charles Carroll of Annapolis, who on April 18, 1757, conveyed a part of the tract on the northwest side of Jones' Falls to William Lyon, which called to run "unto Jones' Falls, then bounding *down* and with the said Falls the twelve following courses," etc.   On the 20th of May,

1757, said Carroll conveyed to Alexander Lawson another part of said tract, also binding on Jones' Falls, on the southeast side. That was described as running "unto Jones' Falls, then bounding *upon* and with the said Falls the seven following courses," etc. On January 26, 1795, Charles Carroll of Carrollton, the heir at law of Charles Carroll of Annapolis, made a deed to John Smith, Benjamin Williams and others, by which he conveyed all that part of Todd's Range which is described as "Beginning for the same at," etc., "and running * * * to the middle or center of the bed of Jones' Falls, thence running in the middle or center of said Falls," etc. The question was whether by the deeds of Charles Carroll of Annapolis, Lyon and Lawson, the grantees, and those claiming under them, were entitled to the land under Jones' Falls to the middle of the stream, or whether the title remained in Charles Carroll of Annapolis so that his heir could convey it to other parties. CHIEF JUDGE CHASE filed a separate opinion, in which he held that the plaintiff, who claimed under Lawson, had a right to recover the land in question to the middle of the bed of Jones' Falls; that Charles Carroll, having title to the land in question and all rights, privileges and advantages derivable therefrom did by his two deeds to William Lyon and Alexander Lawson, convey the same to them and thereby did divest himself of all right and interest in the same. The CHIEF JUDGE reached the same conclusion as the majority of the Court, but on different grounds, and JUDGE BUCHANAN delivered the opinion for the majority. The case was represented by distinguished attorneys, Messrs. Harper and Taney (afterwards Chief Justice of the United States), were for the appellants, and Messrs. Pinkney, Winder and Williams (assistant attorney general), for the appellee.

JUDGE BUCHANAN said: "It is very certain that by the common law the right was in the King of England; and it seems equally clear to me, that he had the capacity to dispose of it *sub modo*. Whatever doubts are entertained on the subject, they probably have arisen from inattention to the dis-

tinction between the power of granting an exclusive privilege in violation or restraint of a common piscarial right or other common right, as that of navigation, and the power of granting the soil *aqua cooperta,* subject to the common user. The subject has, *de communi jure,* an interest in a navigable stream, such as a right of fishing and of navigating, which can not be abridged or restrained by any charter or grant of the soil or fishery since *Magna Charta* at least. But the property in the soil may be transferred by grant, *Hargrave's Law Tracts,* 17, 22, 36, 37—subject, however, to the *jus publicum,* which can not be prejudiced by the *jus privatum* acquired under the grant. This distinction runs through all the books, and wherever grants have been held not to pass the soil, it was not because the King had not the capacity or right to grant it, but because there were not apt words in the grant to effect the purpose."

Again, he said: "It seems to be admitted that as the lands conveyed by Carroll to William Lyon and Alexander Lawson are described in the deeds as bounding upon Jones' Falls, if that had been a private river, they would have been entitled to hold to the middle of the stream; and, if I am right in supposing that the property in the soil was Carroll's, subject only to the common user, I can not perceive why Jones' Falls, when the bed had become private property, should not be subject, *sub modo,* to the same rules (as to the right to the soil) that prevail in relation to private rivers, which are private property. In many respects the same rules do prevail."

Then on page 206 he said: "If, therefore, where a man, having an estate through which a private river runs, conveys away his land lying on one side of the stream and describes it as bounding on the river, the purchaser will, by operation of law, hold to the middle, it would seem, by parity of reason, that if the same man, having an estate through which a public river runs, the soil of the bed of which makes a part of his estate as in the case of a private river, conveys away the land lying on one side, and makes the river the boundary, the purchaser would by the same operation of law

be entitled to hold, in respect of the right of soil, to the middle of the stream."

He concluded his opinion by saying: "All the lands in this State have not been distributed or granted out to the citizens as they are supposed to have been in England; but unnavigable rivers, and lands not patented, are as much the property of the State, as public rivers in England are the property of the King. And if the State grants a tract of land, bounding on an unnavigable river, I hold the rule before alluded to, to apply, and that the grantee will be entitled to the soil to the middle of the stream. And applying the same rule to this case, I think that Alexander Lawson, under his deed from Charles Carroll, was entitled to hold to the middle of Jones' Falls, and agree with the CHIEF JUDGE that the appellant is entitled to recover the land which forms the subject of this suit."

JUDGES JOHNSON and MARTIN concurred in that opinion. JUDGE EARLE dissented, holding that the bed of Jones' Falls still belonged to Carroll after the deeds made by him to Lyon and Lawson. It is, therefore, seen that the question was directly presented, and our predecessors held that although the deeds called to run "unto Jones' Falls, then bounding *down* and with the said Falls," in the one case, and "unto Jones' Falls, then bounding *upon* and with the said Falls," in the other, the grantees took title to the middle of the bed of the stream, which was conceded to be a navigable stream. Although that case has been cited at least fourteen times (see *Shepard's Md. Cit.*) it has never been overruled, and it might affect titles to land to overrule a case which had been accepted as law for so many years. The Act of 1862, Chapter 129, which is now embraced in sections 47, 48 and 49 of Article 54 of the Annotated Code, made considerable changes in the laws of this State as to rights on navigable waters, but as that Act is not applicable to this case, we need not refer to it further, except to say it now prohibits patents for lands covered by navigable waters, and gives valuable riparian rights to the proprietors of land bordering on them. Other

Acts, such as that of 1745, Chapter 9, had been passed years before, and they had in view giving such proprietors of land the benefit of the waters on which their lands bordered. The decision in *Browne* v. *Kennedy* was a logical one, as the general principle is that, in the absence of a statute regulating it, the extent to which a deed of an owner of land abutting on a street or stream goes depends upon how far his title extends, unless he limits the conveyance by appropriate terms.

In 2 *Devlin on Real Estate,* Sec. 1028, it is said the rule is that when lands are bounded by navigable streams or tidewaters, the grantee's right extends only to high-water mark, but that is because it is very unusual for the grantor to own the bed of a navigable stream, and if he does, according to *Browne* v. *Kennedy,* the same rule applies as in case of non-navigable waters. After giving some illustrations in Section 1028, the author in Section 1028A gives reasons which are very applicable to this case when we keep in mind *Browne* v. *Kennedy.* That section, in part, is:

"Reasons for These Rules—The natural presumption where a deed conveys land bordering on a stream or highway is, that the grantor means to convey what he owns, and not to reserve a strip of land of no value to him, but the loss of which to the grantee might be productive of great injury. He has power by apt words to reserve what and as much as he pleases, or so to frame the language of his coveyance as to limit the land conveyed to the line of the stream or highway, without extending further, and in all such cases, courts are bound to give effect to his expressed intention. But in the absence of words showing such an intention, it is not presumed that the grantor intended to retain in himself the fee to the street or stream when he has parted with the adjoining land. Therefore it may be said to be a universal rule, that a deed giving a stream as a boundary will convey title to the center of the stream or to low or high water mark, *depending upon how far the grantor's title extends.* By such a description the grantor will convey all that he owns, unless a contrary intent appears from the language of the deed.

The deed is taken most strongly against the grantor in the application of this rule and courts will not favor the presumption that he has retained title to the bed of the stream."

In the note to the case of *Hanlon* v. *Hobson,* 24 Col. 284, as reported in 42 *L. R. A.* 552, the annotator says: "A grant bounding on a stream or on tide water will be held to carry all the land owned by the grantor, in the absence of anything to show an intention not to do so. If the grantor owns to the thread of the stream, the grantee will also do so." See also *Braxon* v. *Bressler,* 64 Ill. 489; *Brooklyn* v. *Smith,* 104 Ill. 429; *Richardson* v. *Prentiss,* 48 Mich. 90; *Hardin* v. *Jordan,* 140 U. S. 380; *Boston* v. *Richardson,* 95 Mass. 155. Although some of these cases are controlled by statutes or ordinances, the principles are discussed.

The language of the deed from Gould to Tyson seems to us to clearly convey the right of Tyson's successors to the middle of the bed of the stream. There can be no intelligent meaning given to the reference "to the waters," if it was not intended to give the grantee the right to use the waters. That is what in reality is done, as the grantee takes it subservient to the rights of the public, and the main advantage in having the title to the bed is to prevent the grantor from interfering with the grantee's use of it. Such rights of the grantees are very similar to those given proprietors of lands on navigable waters by Sections 47, 48 and 49 of Art. 54 above referred to.

We see no difficulty about the deed for the bed of Gould street. The plaintiff's predecessor conveyed that. The appellee has acquired all the land on both sides of that street, which one or more of the deeds speaks of as vacated, and also the title to the bed of the street. Any attempted dedication of it was not, so far as the record shows, accepted or anything done by the city in reference to it. As the city is not a party to this case, of course what we say will not affect any right it may have, but as we are informed by the record that the title to both sides of the street and to the bed of the street is vested in the appellee, we can have no doubt that, at

least for the purposes of this case, the dedication, if any,
must be treated as revoked. *Clendenin* v. *Md. Construction
Co.,* 86 Md. 80. That being so, the conveyance of the bed of
the street from its northerly terminus to its southerly termi-
nus at Herring Pond is sufficient to carry whatever right the
Gould estate had in the bed of the pond in front of the
street. When the street was laid out by Gould "for the
benefit of the purchasers of his ground fronting thereon,"
and went to Herring Pond, the purchasers surely were
intended to have the right to use that pond in any way not
contrary to the rights of the public, and as the appellee is the
sole owner of the properties binding on it, the appellant
would have no right to eject it from the pond, regardless of
the question whether the dedication is revoked. The plea of
"not guilty" not only puts in issue the title to the premises,
but the right of possession.

So without prolonging this opinion further by discussing
other questions raised, we are satisfied that the plaintiff is
not entitled to recover and we will not discuss the prayers
separately. We will require the appellant to pay the costs.
As there is nothing in the record to show whether the suit
was brought with the approval of the equity court that had
jurisdiction over the trust, that Court can determine whether
he shall be reimbursed out of the trust funds for the costs to
be paid by him.

*Judgment affirmed, the appellant to pay the costs.*