871 A.2d 612

Nancy R. STANSBURY

v.

MDR DEVELOPMENT, L.L.C.

No. 1555, Sept. Term, 2003.

Court of Special Appeals of Maryland.

April 4, 2005.

---

Charles R. Schaller (Sarah Andrews, Schaller & Gorski, L.L.P., on the brief), Annapolis, for Appellant.

Cynthia E. Young, Annapolis, for Appellee.

Panel: HOLLANDER, KENNEY, and MEREDITH, JJ.

KENNEY, Judge.

Appellant/cross-appellee, Nancy R. Stansbury, appeals the decision of the Circuit Court for Anne Arundel County permitting appellee/cross-appellant, MDR Development, L.L.C. ("MDR"), to construct a footbridge above a submerged portion of her property, title to which she traces to a land patent. Ms. Stansbury presents three questions, which we have consolidated and rewritten as follows: [1]

1. Did the circuit court err in finding that MDR could construct a footbridge above the submerged portion of property owned by Ms. Stansbury?

2. Did the circuit court err in finding that the construction of the footbridge above Ms. Stansbury's submerged property did not constitute a trespass?

MDR poses one question in the alternative, which we have reworded as follows: [2]

---

1. Stansbury posed the following:

 1. As one of the sticks in the bundle of property rights, does Ms. Stansbury have rights to the superjacent airspace above her property held by land patent?
 2. Do Ms. Stansbury's property rights in the lands beneath navigable water held by land patent and the superjacent airspace preclude a trespass with the construction of a footbridge across and through her property?
 3. Did the trial court commit reversible error by using the wrong standard and concluding that a footbridge could be built across the property held by the owner of a land patent?

2. MDR posed the following:

Did the circuit court err in denying MDR an easement over Ms. Stansbury's property?

For the following reasons, we shall vacate and remand to the circuit court for the entry of a declaratory judgment recognizing MDR's easement for the construction of a footbridge.

## FACTUAL AND PROCEDURAL HISTORY

This case concerns property located in the Pleasant Plains subdivision in Anne Arundel County, Maryland and shown below.

Our primary focus is on lots 178, 179, 9A, and 10A, which, along with the other lots shown, were platted prior to the creation of the channel. As platted, lots 179 and 10A shared a common lot line, as do lots 178 and 9A. The common lot lines are below and approximately midway the channel. The depth of the channel varies with the tide, but it is stipulated to be navigable. The channel provides the eight lots shown above with water access to Pleasant Lake and, through the lake, to the Chesapeake Bay.[3]

On April 2, 1936, James Edward Stansbury, Ms. Stansbury's father, acquired fee simple title to these four lots,

---

Is cross[-]appellant MDR entitled to the declaration of an easement over [Ms.] Stansbury's submerged property?

**3.** Lots 179 and 10A have direct access to the lake and lots 10A and 9A, along with the other bay front lots, have direct access to the Chesapeake Bay.

subject to a life estate in Mallee B. Moore, Ms. Stansbury's maternal grandmother. At the time, Mr. Stansbury lived on Lot 7A, and in the mid 1950s he dredged the channel. After the channel was created, a footbridge, approximately 100 to 150 feet in length, was constructed over the channel in lots 9A and 178. Laura Stansbury, Ms. Stansbury's mother, who resided on Lot 7A, used the footbridge to visit and care for her mother, Mallee B. Moore, who resided on Lot 179. The middle portion of the footbridge could be removed to allow small boats to traverse the channel and seek safe harbor during storms.

According to Ms. Stansbury, the Stansburys had little reason to utilize the footbridge after Mallee B. Moore's death in 1973, and it fell into a "state of disuse." The Stansburys, who lived on Lot 7A, and who had access to Lot 10A across lots 8A and 9A, made little use of Lot 10A as the result of extensive erosion. She described Lot 10A as a "rubble filled marshland with an old pier that extends into the Chesapeake Bay."

James Edward Stansbury died testate on March 25, 1977; Ms. Stansbury, Laura Stansbury, and Ms. Stansbury's brother, James Elijah Stansbury, were the legatees of Mr. Stansbury's property. On December 12, 1984, Laura Stansbury, individually and as personal representative of her husband's estate, entered into an Agreement of Distribution with her children to convey title to lots 178, 179, 9A, and 10A to the children as tenants in common as a part of their inheritance. The children, in turn, would determine how the lots would be divided between them. For whatever reason, Laura Stansbury did not abide by the agreement; she never conveyed the lots to her children.

On December 30, 1986, Ms. Stansbury, who had resided on Lot 179 since 1983, executed a deed transferring her interest in lots 178 and 10A to her brother, and he executed a deed transferring his interest in lots 179 and 9A to her. Later, because Laura Stansbury had not transferred the lots to the children, Ms. Stansbury filed a complaint to compel her mother to execute the deeds. Michael R. Robyler was appointed as

a trustee to complete the transfer, and in March 1987, Ms. Stansbury and her brother were deeded fee simple title to their respective lots, as contemplated by the December 30, 1986 conveyances.

On February 22, 1988, James Elijah Stansbury mortgaged his two lots, 178 and 10A, to secure a $200,000 note to Francis C. and Shirley C. Cole. He defaulted on the note, and, in 1995, the property was acquired at a foreclosure sale by David L. and Charlotte Caldwell and James L. and Margaret F. Thrift (hereinafter collectively "Caldwell").

When David Caldwell visited the property prior to the foreclosure sale, he observed an uninhabitable house on Lot 178, the pier located on Lot 10A, and the footbridge. He testified that the footbridge was in "passable" condition at that time, and that Ms. Stansbury had escorted him across the footbridge during his visit. Later, when he requested her permission to repair the footbridge to facilitate travel to Lot 10A, Ms. Stansbury would not agree. She expressed interest in purchasing lots 178 and 10A from Caldwell, but no agreement was reached. Sometime in 1997, an "eight to twelve" foot long portion from the center of the footbridge was removed and a "no trespassing" sign was posted on the portion of the footbridge located on Lot 9A.

In 1997, Caldwell obtained a variance from Anne Arundel County to construct a residence on Lot 178. On April 20, 1998, Caldwell entered into an agreement with the County to treat lots 178 and 10A as one lot. The agreement, which was recorded among the land records of Anne Arundel County, provided that

all interior lot lines connecting [lots 178 and 10A] shall no longer be considered lot lines for any purposes, including those set forth in the Anne Arundel County Code; it being the intent of both parties that the aforementioned lot shall be considered now and forevermore as one single lot or parcel of ground and that all other requirements of law now in full force and effect or hereinafter effective shall be applicable as if such property is one parcel of ground.

On October 13, 1998, in a document entitled Declaration of Easement Conditions and Restrictions, which was recorded in the land records of Anne Arundel County, Caldwell agreed not to construct any structure on Lot 10A, with the exception of a footbridge after obtaining all necessary Federal, State, and local permits for its construction. As proposed, the footbridge would extend across the channel from Lot 178 directly to Lot 10A. The right to construct the footbridge is at the heart of this controversy.

In 1999, Caldwell initiated a two-count complaint against Ms. Stansbury, asserting entitlement to an easement across a portion of lot 9A in order to gain access to 10A. The complaint sought declaratory relief in addition to monetary damages in the amount of $100,000. Michael D. Reisinger, sole owner of MDR, had first visited lots 178 and 10A in 1996 or 1997. MDR purchased the lots from Caldwell on October 15, 2001. On October 25, 2001, MDR was substituted as the party plaintiff.

Trial was held on September 27, 2002, and November 1, 2002. In addition to the evidence summarized above, Ms. Stansbury offered evidence as to how her property, lots 179 and 9A, would be adversely affected by the construction of the footbridge. She also testified that a footbridge would obstruct navigation in the channel and lower the property values of the riparian owners.

John Dowling, admitted as an expert witness "in the fields of title searching, real property issues, and surveying," testified that in 1807 a land patent was issued to the land known as Grammer's Pleasant Plains. According to Dowling, as a result of that land patent, Ms. Stansbury is the "supreme" title holder of those portions of lots 179 and 9A beneath the channel over which the footbridge would cross.

On August 19, 2003, in a memorandum opinion and order, the circuit court determined that

[MDR] is not entitled to the declaration of an easement over [Ms. Stansbury's] property to facilitate pedestrian travel between Lots 178 and 10A. [MDR] is entitled to construct a

footbridge—subject to all Federal, State and local regualtions [sic]—between Lots 178 and 10A free from any unsubstantiated claim by [Ms. Stansbury] that said footbridge will interfere with her property rights to a portion of land submerged beneath the water in the channel.

Ms. Stansbury noted this timely appeal and MDR cross-appealed.

## STANDARD OF REVIEW

Maryland Rule 8–131(c) provides:

**Action tried without a jury.** When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

As to the circuit court's factual findings, we look to whether those findings were supported by "substantial evidence" in the record. *Liberty Mut. Ins. Co. v. Maryland Auto. Ins. Fund,* 154 Md.App. 604, 609, 841 A.2d 46 (2004). When " 'there is any competent, material evidence to support the factual findings below, we cannot hold those findings to be clearly erroneous.' " *Cannon v. Cannon,* 156 Md.App. 387, 404, 846 A.2d 1127 (2004) (citing *Shallow Run Ltd. Partnership v. State Highway Admin.,* 113 Md.App. 156, 174, 686 A.2d 1113 (1996)), *aff'd* 384 Md. 537, 865 A.2d 563, 2005 WL 48605 (2005). "Although the factual determinations of the circuit court are afforded significant deference on review, its legal determinations are not." *Liberty Mut. Ins. Co.,* 154 Md.App. at 609, 841 A.2d 46. "Indeed, the appropriate inquiry for such determinations is whether the circuit court was 'legally correct.' " *Id.* (citing *Maryland Envtl. Trust v. Gaynor,* 140 Md.App. 433, 440, 780 A.2d 1193 (2001)).

## DISCUSSION

### I. Declaratory Judgment

The Maryland Uniform Declaratory Judgments Act ("the Act"), Maryland Code (1974, 2002 Repl. Vol.), § 3–401 *et seq.*

of the Courts & Judicial Proceedings Article ("CJ"), is "remedial" and its purpose is "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." CJ § 3–402.

CJ § 3–409(a) provides:

(a) *In general.*—Except as provided in subsection (d),[4] a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if:

(1) An actual controversy exists between contending parties;

(2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or

(3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.

"The declaration may be affirmative or negative in form and effect and has the force and effect of a final judgment or decree." CJ § 3–411; *see Universal Underwriters Ins. Co. v. Lowe*, 135 Md.App. 122, 130–31 n. 6, 761 A.2d 997 (2000) (" 'While a declaratory decree need not be in any particular form, it must pass upon and adjudicate the issues raised in the proceeding, to the end that the rights of the parties are *clearly* delineated and the controversy terminated.' ") (emphasis supplied in *Universal Underwriters Ins. Co.*) (quoting *Dart Drug Corp. v. Hechinger Co.*, 272 Md. 15, 29, 320 A.2d 266 (1974)). Declaratory proceedings, however, are " 'not intended to and *should not serve as a substitute for appellate review or as a belated appeal.*' " *Wolfe v. Anne Arundel County*, 135 Md.App. 1, 25, 761 A.2d 935 (2000) (emphasis supplied in *Wolfe* ) (quoting *Fertitta v. Brown*, 252

---

4. Subsection (d) states:

(d) *Exception as to divorce or annulment of marriage.*—Proceeding by declaratory judgment is not permitted in any case in which divorce or annulment of marriage is sought.
CJ § 3–409(d).

Md. 594, 599–600, 251 A.2d 212 (1969)), *aff'd,* 374 Md. 20, 821 A.2d 52 (2003).

In *Harford Mut. Ins. Co. v. Woodfin Equities Corp.,* 344 Md. 399, 414, 687 A.2d 652 (1997) (internal citations omitted), the Court of Appeals stated:

This Court has reiterated time after time that, when a declaratory judgment action is brought, and the controversy is appropriate for resolution by declaratory judgment, "the trial court must render a declaratory judgment." "[W]here a party requests a declaratory judgment, it is error for a trial court to dispose of the case simply with oral rulings and a grant of ... judgment in favor of the prevailing party."

The fact that the side which requested the declaratory judgment did not prevail in the circuit court does not render a written declaration of the parties' rights unnecessary. As this Court stated many years ago, "whether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the judgment or decree defining the rights of the parties under the issues made."

Because the circuit court did not enter a judgment declaring the rights of the parties as requested, the case will be remanded to the circuit court for that purpose. That omission, however, is not jurisdictional, and we will address the merits of the controversy. *See Bushey v. Northern Assur. Co. of Am.,* 362 Md. 626, 651, 766 A.2d 598 (2001) (finding that the Court of Appeals "may, in its discretion, review the merits of the controversy and remand for the entry of an appropriate declaratory judgment by the circuit court"); *Maryland Ass'n of HMO v. Health Servs. Cost Review Comm'n,* 356 Md. 581, 604, 741 A.2d 483 (1999) (requiring on remand that the circuit court enter a judgment which included a declaration of the rights of the parties). *See also Messing v. Bank of America, N.A.,* 143 Md.App. 1, 23, 792 A.2d 312 (2002), *aff'd,* 373 Md. 672, 821 A.2d 22 (2003); *Eller Media Co. v. Montgomery County,* 143 Md.App. 562, 603–04, 795 A.2d 728, *cert. denied,* 369 Md. 573, 801 A.2d 1033 (2002).

## II. The Land Patent of 1807

### A. Land Patents Generally

Ms. Stansbury contends that the circuit court erred in determining that MDR could construct a footbridge across her property. Because she relies, in part, on the 1807 land patent, we begin with a brief discussion of land patents.

A land patent is "an instrument by which the government conveys a grant of public land to a private person" *Black's Law Dictionary* (8th ed. 2004). In *Marquardt v. Papenfuse,* 92 Md.App. 683, 610 A.2d 325 (1992), Judge Cathell provided the following history of land patents in Maryland:

> Maryland began in 1632 as the private and exclusive property of the head of one family, the Calverts, Irish Barons of Baltimore. When the King granted Maryland to Lord Baltimore on June 20, 1632, making him the *Lord Proprietor* of Maryland, he did so absolutely and without qualification with regard to the right to grant and, as in this case, regrant land. That power has passed undisturbed to the Commissioner acting on behalf of the State.
>
> The language of the Charter of Maryland is archaic but clear with regard to Lord Baltimore's right to grant and regrant land as he saw fit[.]
>
> \* \* \* \* \* \*
>
> Prior to 1776, the only serious challenge to Lord Baltimore's rights with regard to the issuance of land patents came in 1689 in the aftermath of the *Glorious Revolution* when Maryland became a Royal Colony. At that time Lord Baltimore's political power, such as the right to appoint the Governor of Maryland, was taken away, but not his power to grant Land Patents.
>
> In 1692, after one Royal Governor attempted to usurp Lord Baltimore's right to grant lands by forcefully removing all of his records, the Solicitor General of England, Thomas Trevor, argued persuasively that the governor had no right to do so: I think it may be just & reasonable that [the records] should be restored to his Lo[rdship] again, and I do

not see any prejudice can thereby happen to the parties by whom such Bills or Bonds [for land] were given, though they have not Executed their Warrants, nor had Certificates [of survey] return'd, for ye bonds can[n]ot be put in Suit till the L[ord] hath p[er]formed the Condition on his p[art] [to grant the lands for which the bonds had been given and the warrants issued].

Between 1776 and 1781, the political powers of Lord Baltimore, which had been restored in 1715, and all of his rights relating to land in Maryland, were taken over by the State. The heirs of the last Lord Baltimore (among whom was the wife of the last Proprietary governor, Sir Robert Eden) attempted to wrest compensation for their losses from the State after the American Revolution, but without success. From 1781 onward the powers over land matters that were once held by Lord Baltimore were vested in the judges of the Land Office, a position that today is titled Commissioner of Land Patents.

*Id.* at 689–91, 610 A.2d 325.

■ Land patents are "the first link in the chain of title of ownership of land in Maryland." *Id.* at 689, 610 A.2d 325. As the Court of Appeals explained in *Bowie v. Western Maryland Railroad Terminal Co.,* 133 Md. 1, 7, 104 A. 461 (1918) (referring to *Browne v. Kennedy,* 5 Har. and J. 195 (1821)):

Whatever the law was elsewhere, that case settled it for this state, and has never been overruled or qualified. It was there held that Lord Baltimore, a proprietor of Maryland, acquired the same right to dispose of land covered by navigable waters within the province, under the charter granted to him by the king, as the king had prior to granting the charter-subject to the right of the public to use it for fishing and navigation. The right to grant land covered by navigable waters afterwards became vested in the state-subject to the same restrictions.

Thus, " '[f]or over 200 years, until 1862, the State (and the proprietor of the colony) patented to individuals, subject to the public rights of navigation and fishery, fee-simple title to land

under water.' " *Wagner v. City of Baltimore,* 210 Md. 615, 622, 124 A.2d 815 (1956) (quoting *Mayor & City Council of Baltimore v. Canton Co.,* 186 Md. 618, 630–631, 47 A.2d 775 (1946)). Indeed, the validity of land patents issued prior to 1862 "has been repeatedly recognized or reaffirmed." *Wagner,* 210 Md. at 622, 124 A.2d 815.

Section 48 of the Act of 1862 prohibited "the issuance of patents to submerged lands covered by navigable waters." *Board of Public Works v. Larmar Corp.,* 262 Md. 24, 39, 277 A.2d 427 (1971). In fact,

> "[t]he Act was passed with the intention and for the purpose of enlarging the rights of riparian owners upon navigable waters of this State by giving to them accretions to their lands . . . and also by giving to them the exclusive right to make improvements in the waters in front of their lands . . . ."

*Van Ruymbeke v. Patapsco Indus. Park,* 261 Md. 470, 479, 276 A.2d 61 (1971) (quoting *Melvin v. Schlessinger,* 138 Md. 337, 113 A. 875 (1921)).

### B. Ownership of the Land Beneath the Channel

▮ A fee simple estate "is the highest form of ownership a person can have in real property because it has no restrictions on its use or enjoyment except those restrictions imposed by public policy for the common good." David A. Thomas, *Thompson on Real Property* § 17.01 at 599 (2 ed. 2000). At trial, Ms. Stansbury produced a copy of the land patent, which undisputedly encompassed all of the property at issue in this case. Title to lots 179 and 9A, now owned by Ms. Stansbury, and for that matter, all the lots at issue, can be traced to the land patent issued in 1807. It is stipulated that the channel, subject to the ebb and flow of the tide, is navigable. Therefore, the respective owners of lots 178, 179, 9A, and 10A, subject to public rights of navigation and fishing, own the portions of those lots beneath the channel.

▮ As Dowling opined, the land patent establishes "the best title possible," and, the owners hold "supreme" title to

this property. In Maryland, "the owner of land in fee holds all of the complex elements of a single right, a bundle of sticks, if you will, which include not only the right to use the surface, but so much of the superjacent airspace as he can use, as well as the subajacent reaches below." *Macht v. Department of Assessments* of Baltimore City, 266 Md. 602, 605, 296 A.2d 162 (1972). Ms. Stansbury has a property interest in the air space above the subaqueous land of which she is the fee simple owner.

While there may be some limitations on the use of airspace, it is obvious that "if a landowner is to have full enjoyment of his land, he must have exclusive control of the immediate reaches of the enveloping atmosphere." *Id.* Accordingly, Ms. Stansbury is entitled to full enjoyment of her subaqueous land, which includes the superadjacent airspace so long as she does not impede the public's right to "fishing and navigation." *Bowie*, 133 Md. at 7, 104 A. 461 (referring *Browne v. Kennedy*, 5 Har. and J. 195 (1821)). Absent an agreement or a legally recognized nonpossessory interest in Ms. Stansbury's property, MDR has only the rights of a member of the general public.

### C. The Right to Construct a Footbridge over the Channel

Ms. Stansbury challenges the circuit court's decision to permit MDR to construct a footbridge across her property without her consent. In its decision, the circuit court, without citation, reasoned:

> [Ms. Stansbury's] underwater land patent requires this Court to balance three competing interests: (1) [MDR's] right to construct a footbridge between his two lots; (2) [Ms. Stansbury's] right to prevent any interference with her interest in a portion of the land submerged beneath the waters in the channel over which a new footbridge must necessarily be constructed and; (3) the public interest in navigation and fishing in the channel.

It then concluded that MDR's interest prevailed and permitted the construction of a footbridge. Neither party has sup-

ported or provided authority in support of this balancing analysis, and we are persuaded that it was in error. Any right that MDR might have to construct the footbridge over Ms. Stansbury's property must arise from an easement.

## III. Easement

MDR contends that the circuit court erred in declining to find that it was entitled to an easement over Stansbury's property. MDR argues that it is entitled to an implied easement under two possible theories: (1) a quasi easement or (2) necessity.

██ An easement is a nonpossessory interest in the real property owned by another. *Boucher v. Boyer,* 301 Md. 679, 688, 484 A.2d 630 (1984). More specifically, an easement

> involves primarily the privilege of doing a certain class of act on, or to the detriment of, another's land, or a right against another that he refrain from doing a certain class of act on or in connection with his own land, the holder of an easement having, as an integral part thereof, rights against the members of the community generally that they shall not interfere with the exercise or enjoyment of the easement.

*Herbert Thorndike Tiffany, Real Property* (3d ed. 1939) § 756 (footnote omitted). Easements can be created under several different circumstances, including: an express grant, implied grant, reservation,[5] prescription, estoppel, or through eminent domain. *See id.* at § 776. Here, our focus is on the concept of an implied grant.

### A. Quasi Easement

The concept of "quasi easement" has been explained as follows:

> One cannot have an easement over one's own land, but one may make use of one part of his land for the benefit of another part, just as, if they were separately owned, the

---

5. For a recent discussion of reservations see *Calvert Joint Venture # 140 v. Snider,* 373 Md. 18, 816 A.2d 854 (2003).

owner of the latter might make use of the former by reason of the existence of an easement in his favor. When one thus utilizes part of his land for the benefit of another part, it is frequently said that a quasi easement exists, the part of the land which is benefitted being referred to as the "quasi dominant tenement" and the part which is utilized for the benefit of the other part being referred to as the "quasi servient tenement." The so-called quasi easement is evidently not a legal relation in any sense, but the expression is a convenient one to describe the particular mode in which the owner utilizes one part of the land for the benefit of the other, as bearing on the question now to be discussed, whether, when the two parts subsequently become the property of different persons, an actual easement is to be regarded as existing, which corresponds to the use which was previously made of the land by the owner of both parts.

*Id.* at § 781 (footnote omitted).

The Court of Appeals, in *McConihe v. Edmonston*, 157 Md. 1, 7, 145 A. 215, 217 (1929) (quoting *Janes v. Jenkins*, 34 Md. 1, (1871)), stated:

"Whenever, therefore, an owner has created and annexed peculiar qualities and incidents to different parts of his estate, (and it matters not whether it be done by himself, or his tenant by his authority,) so that one portion of his land becomes visibly dependent upon another for the supply or escape of water or the supply of light and air or for means of access, or for beneficial use and occupation, and he grants the part to which such incidents are annexed, those incidents thus plainly attached to the part granted, and to which another part is made servient, will pass to the grantee, as accessorial to the beneficial use and enjoyment of the land."

■ The implied grant is based on the presumed intentions of the parties, and the expectation of the grantee that the property conveyed would have the benefit of any easements and privileges as it had enjoyed before. *See Burns v. Galla-*

*gher,* 62 Md. 462, 472–73 (1884); *Knight v. Mitchell,* 154 Md. 102, 105, 140 A. 74 (1928).[6]

The circuit court concluded that there was no easement corresponding to a pre-existent quasi easement in this case because "there [was] no evidence that the old footbridge was used to facilitate access between lots 178 and 10A before unified title to the lots was severed in 1986/1987." The court continued, "There was no testimony that the footbridge was used for any other purpose, particularly as it relates to facilitating pedestrian traffic between lots 178 and 10A. In addition, there is no physical evidence of a path on Lot 10A which is consistent with the route now proposed by [MDR]."

Although these particular factual findings by the circuit court might not be clearly erroneous, we are persuaded that its narrow focus on the use of the old footbridge in relationship to lots 178 and 10A was in error. Lot lines have little practical significance when the lots are under common ownership. Prior to the creation of the channel, the four lots were all owned by Mr. Stansbury, subject to a life estate. They represented a parcel of land with direct access to the bay front, which includes what is now Lot 10A, from any part of the parcel. With the creation of the channel, Mr. Stansbury effectively divided the one parcel into two, and, as a result, one parcel, comprised of lots 178 and 179, was separated from the bay front parcel, comprised of lots 9A and 10A.

Although the evidence would support a finding that the footbridge had been used primarily by Laura Stansbury to visit her mother, the need for the footbridge was the newly created channel. The location of the footbridge was not dependent upon the ownership of lots because Mr. Stansbury owned all the lots. When Ms. Stansbury and her brother

---

6. In *Hancock v. Henderson,* 236 Md. 98, 104 n. 2, 202 A.2d 599 (1964), Judge Marbury, citing *Condry v. Laurie,* 184 Md. 317, 41 A.2d 66 (1945), indicated that in cases involving remote grantees of the original parties, an implied grant of a way of necessity is imposed by law rather than the presumed intention of the parties.

owned the lots, as she acknowledged, either could have used the footbridge to access their lots across the channel.

With Mr. Stansbury's death, title to the property passed through the appointed trustee to Ms. Stansbury and her brother. Ms. Stansbury took legal title to lots 179 and 9A; James Elijah Stansbury took title to lots 178 and 10A. In other words, each received both a bay front lot, a lake front lot, and a non bay front lot.[7] The transfer of the lots has the effect of a partition. As such, it is to be treated as a simultaneous conveyance to which the more liberal implied grant rule applies. *Dalton v. Real Estate Imp'vt Co. of Baltimore City*, 201 Md. 34, 47, 92 A.2d 585 (1952). Quoting Section 140 of *Jones on Easements*, 15 (1898 Ed.), the Court of Appeals in *Dalton* said that such a transfer "carries with it by implication any continuous easement reasonably necessary for the enjoyment of each part, which had been plainly and obviously enjoyed before partition. Such an easement is appurtenant to the parcels into which the land is severed by the partition...." *Dalton*, 201 Md. at 47–48, 92 A.2d 585. Unity of ownership at the time the quasi easement was created is not at issue in this case. *Johnson v. Robinson*, 26 Md.App. 568, 574, 338 A.2d 88 (1975). Thus, whether an easement to cross the channel by footbridge is to be implied depends on whether it "would be classed as continuous and apparent, and necessary to the reasonable enjoyment of the property conveyed." *Dalton*, 201 Md. at 46, 92 A.2d 585 (citing *Eliason v. Grove*, 85 Md. 215, 36 A. 844 (1897); *Burns v. Gallagher*, 62 Md. 462 (1884)).

An easement is apparent if the existence of the easement could have been seen by a person in ordinary contact with the land, even if it is "not readily or entirely visible." *Tiffany* at § 784. Its use may be considered to be continuous when there is a permanent adaptation of the

---

7. The reason behind the "checkerboard" division of the four lots is not explained. It might have been a means to avoid forced lot consolidation of adjacent lots or relate to the value of the individual lots. In any case, the reason is not material to this opinion.

dominant and servient tenements in regard to the easement. *Kelly v. Nagle,* 150 Md. 125, 131, 132 A. 587 (1926). In the case of an implied grant, to be necessary simply means necessary for the "reasonable enjoyment" of the dominant tenement. *Id.*

■ Based on our review of the evidence, including the photographs, the existence of the footbridge itself could satisfy the requirement that the easement be apparent and continuous. The evidence would support a finding that the footbridge was clearly visible at the time Ms. Stansbury and her brother took their separate title to the lots. It was still there and "passable" at the time of the foreclosure. Although it might have been in need of repair, the footbridge could be considered a permanent adaptation of the property to accommodate passage across the channel. *Eliason v. Grove,* 85 Md. 215, 223, 225, 36 A. 844 (1897) (stating that if, "during the unity of ownership, the owner of two properties uses one for the benefit of the other in such manner as would have given rise to the presumption that an easement existed if the tenements had been held by different persons, then, upon a conveyance of the property so used, an easement will be granted to the purchaser, provided the use has been such that an easement resulting from it would be of the class known as continuous and apparent, and would be necessary for the reasonable enjoyment of the property conveyed"); *Kelly v. Nagle,* 150 Md. at 134, 132 A. 587 (stating that courts in New Jersey, Indiana and New York support the view that, "if there is a permanent adaptation of the two tenements to the exercise of the easement, it is continuous"). In the case of an implied grant either of a quasi easement or a way of necessity, the more liberal standard of "necessary to the reasonable enjoyment of the property conveyed" rather than the strict necessity of an implied reservation applies. *Johnson v. Robinson,* 26 Md.App. 568, 579, 338 A.2d 88 (1975) (quoting *Dalton,* 201 Md. at 46, 92 A.2d 585 (citing *Burns,* 62 Md. 462)). The circuit court found in its balancing analysis that pedestrian access from Lot 178 to Lot 10A was necessary for the reasonable enjoyment of bay front property and reconstructing the pier

for recreational purposes. Had the circuit court concluded that the right to use the footbridge was implied, we would not find error as a matter of law.

Nevertheless, the party seeking the easement has the burden to prove its existence by clear and convincing evidence. *John R. Kennel, Easements and Licenses in Real Property,* 25 Am. Jur. 2d, § 116 (2004). Any analysis should be made in the first instance by the fact finder and not by an appellate court. But because the evidence, and the circuit court's findings based on that evidence, provide sufficient basis to find the existence of an implied easement by necessity, we need not remand to the circuit court for reconsideration of a quasi easement.

### B. Ways of Necessity

An easement by necessity is

an easement which arises upon a conveyance of land, in favor of either the grantor or grantee of the land, by reason of a construction placed upon the language of the conveyance in accordance with what appears to be the necessity of the case, in order that the land conveyed, or sometimes, the land retained, may be properly available for use.

*Tiffany* at § 792. An easement by necessity is typically declared when one conveys land to another, which is entirely surrounded by the grantor's land or which is accessible only across the grantor's land or the land of a stranger. Courts favor the full use of land. *Id.* at § 793.

"Ways by necessity are a special class of implied grants and have been recognized in this State for a good many years." *Hancock v. Henderson,* 236 Md. 98, 102, 202 A.2d 599 (1964). Factors to be considered when analyzing an easement by necessity include common ownership, division creating land-locked property, and necessity. The necessity is to be "determined from the conditions as they existed at the time of the conveyance." *Id.* at 104, 202 A.2d 599. An easement of necessity exists only as long as the necessity itself remains. *Id.* at 105, 202 A.2d 599.

 At the time of, and as the result of, the conveyance of separate non contiguous lots to Ms. Stansbury and her brother, the platted lot lines took on a significance that did not exist during periods of common ownership. As a result of the conveyances, the only access to Lot 10A from Lot 178, as recognized by the circuit court, "is either by small boat or walking through the channel at low tide." In response to MDR's argument that such access was unreasonable, the circuit court expressly found "that a pedestrian walkway is necessary for the reasonable use and enjoyment of [MDR's] riparian rights in the Chesapeake Bay." Despite that finding, the circuit court did not find a way of necessity by limiting its focus to the old footbridge. It found that the old footbridge was "not necessary for pedestrian travel between Lots 178 and 10A" because the proposed footbridge utilized a "new route" that directly connected Lot 178 and Lot 10A and did not require MDR to enter upon Ms. Stansbury's property. But, having found a pedestrian walkway necessary for the reasonable use and enjoyment of MDR's riparian rights, the circuit court permitted the proposed footbridge based on a balancing of the parties' respective interests.

As explained above, the proposed footbridge does have an impact on Ms. Stansbury's property rights in lots 179 and 9A, even though it might not be physically constructed on her land above the channel. Even if the circuit court was not prepared to recognize the grant of an implied quasi easement, its findings clearly supported a way of necessity for the reasonable enjoyment of Lot 10A.

The Court of Appeals has considered the issue of whether an easement of necessity over land may exist even when there is access to the dominant estate by navigable waters. We find the case of *Hancock v. Henderson*, 236 Md. 98, 202 A.2d 599, instructive. In that case, Henderson owned a piece of property that was surrounded by land owned by Hancock on one side, by St. Thomas Creek on another side, and by land owned by others on the three remaining borders. Henderson's land had been conveyed in 1898 out of the tract, the remainder of which was now owned by Hancock. No house had been built

on the Henderson tract, and it had only been used by its previous owners for timber and gathering firewood. Henderson acquired the tract in 1948, but it was not until the early 1960s that he sought to establish a dwelling on it. Henderson claimed an easement through an old roadway that ran through Hancock's land to the Henderson tract, but Hancock forbade its use. The evidence established that the road had been used in 1911 for a sawmill operation, but not that the roadway had existed in 1898 when the Henderson tract was first conveyed.

The Court, after considering prior case law, determined that the fact that the Henderson tract bordered on St. Thomas Creek was not a bar to raising an easement by necessity over land because

> [t]he more modern view, for sound reasons of social policy, is that alway [sic] of necessity may exist over the land of the grantor even through the grantee's land borders on a waterway, if the water route is not available or suitable to meet the requirements of the uses to which the property would reasonably be put.

*Hancock,* 236 Md. at 103, 202 A.2d 599.

■■■ We hold, based on the circuit court's findings that the only access to Lot 10A by the owners of Lot 178 is "by small boat or walking through the channel at low tide" and "that a pedestrian walkway is necessary for the reasonable use and enjoyment of [MDR's] riparian rights in the Chesapeake Bay," that MDR is entitled to an easement by necessity over Ms. Stansbury's submerged property in order to access Lot 10A. Because lots 178 and 10A were not occupied at the time of the conveyances to Ms. Stansbury and her brother, there was no reason to cross the channel on any regular basis. With the development of lots 178 and 10A, the easement became necessary for the enjoyment of the property, and the right to cross the channel over Ms. Stansbury's property can be claimed. In other words, "non-use alone is not sufficient to extinguish a way by necessity," and the evidence does not support abandonment. *Id.* at 105, 202 A.2d 599.

The circuit court found that Ms. Stansbury and her brother did not intend to create the easement over the footbridge, relying on her testimony that she "never intended" to grant her brother permission to use the footbridge, that she did not remember her family using Lot 10A, and that she did not consider whether the footbridge would be to travel between lots 178 and 10A. She also testified that her brother shared her view and "was not interested" in using the old footbridge to travel between lots 178 and 10A.[8] Not only is the implied grant to be viewed from the standpoint of the grantee, Ms. Stansbury's testimony alone is not sufficient to establish her brother's state of mind.

The circuit court also commented on the fact that James Elijah Stansbury did not "reserve" an easement. As explained earlier in this opinion, when there is a simultaneous transfer in the nature of partition, the implied grant rule applies.

## C. Location of the Easement

In the case of a quasi easement, the location is ordinarily established by previous use. In this case, the location would be that of the old footbridge, which could be repaired and maintained for that purpose. In the case of an easement by necessity, prior use is also evidence of the location to be used. But our appellate courts have recognized, in cases involving both implied grants and implied reservations of ways of necessity, that an equitable disposition requires the circuit court to determine a location that will be fair to both parties and will inconvenience the owner of the servient parcel "only so much as is necessary to provide" the owner of the dominant parcel reasonable access to his land. *Johnson*, 26

---

8. As noted, of the four lots to be divided between Ms. Stansbury and her brother, two are back lots fronting on the channel and two are bay front with access to the channel. Ms. Stansbury's testimony regarding the potential use of Lot 10A would suggest it had little value to her brother or any subsequent grantee. It might also suggest that the division was not equal or nearly equal. See footnote 6.

Md.App. 568, 582, 338 A.2d 88; *see also Hancock,* 236 Md. at 105–106, 202 A.2d 599.

MDR has not insisted that the easement be established over the old footbridge. Instead, it has proposed the construction of a new footbridge at the location that the circuit court obviously believed would least impact Ms. Stansbury's property interests while accommodating MDR's right to reasonable access to Lot 10A, subject to applicable governmental regulations. Of course, the parties themselves may agree on another location that is mutually satisfying to them, but in the absence of such agreement, the circuit court's approval of MDR's proposed pedestrian walkway directly connecting Lot 178 and Lot 10A was neither clearly erroneous nor an abuse of discretion.

## IV. Trespass

Because we have determined that MDR is entitled to an easement by necessity, it is unnecessary for us to determine whether construction of the bridge would constitute a trespass on Ms. Stansbury's land. *Windsor Resort, Inc. v. Mayor and City Council of Ocean City,* 71 Md.App. 476, 485, 526 A.2d 102 (1987).

## CONCLUSION

We shall vacate the circuit court's judgment that there was no implied grant of either a quasi easement or an easement by necessity, and remand this case to the circuit court. Because we hold that MDR is entitled to a declaration establishing an easement by necessity, subject to government regulation, for a pedestrian walkway in order to reasonably use and enjoy Lot 10A, it would not be necessary for the circuit court to revisit the issue of a quasi easement. A declaratory judgment should be entered to the effect that, subject to public rights of navigation and fishing, Ms. Stansbury owns in fee simple those portions of lots 9A and 179 beneath the channel; that MDR, subject to public rights of navigation and fishing, owns in fee simple those portions of lots 10A and 178 beneath the channel; and that MDR, subject to applicable laws and governmental

regulations, is entitled to an easement by necessity over either lot 9A or 179, or both, as reasonably necessary to establish pedestrian access by a footbridge between Lot 178 and Lot 10A.

JUDGMENT VACATED AND CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.

COSTS TO BE PAID 1/2 BY APPELLANT AND 1/2 BY APPELLEE.